RECEIVED IN CLERK'S OFFICE
U.S.D.C. - Atlanta

JUL 0 1 2021

KEVIN P. WEIMER, Clerk
By: _____ Deputy Clerk

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
_____ **DIVISION**

FILED IN CLERK'S OFFICE
U.S.D.C. Atlanta

JUL 0 1 2021

KEVIN P. WEIMER, Clerk
By: _____ Deputy Clerk

TUMANI S. MUTASA NYATEKA
(Print your full name)

Plaintiff *pro se*,

v.

THE INTERDENOMINATIONAL

THEOLOGICAL CENTER/

GAMMON,
(Print full name of each defendant; an
employer is usually the defendant)

Defendant(s).

By:

CIVIL ACTION FILE NO.

**1:21-CV-2664**

(to be assigned by Clerk)

## *PRO SE* EMPLOYMENT DISCRIMINATION COMPLAINT FORM

### Claims and Jurisdiction

1.   This employment discrimination lawsuit is brought under (check only those
that apply):

✓     Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e et
seq., for employment discrimination on the basis of race, color,
religion, sex, or national origin, or retaliation for exercising rights
under this statute.

**NOTE**: To sue under Title VII, you generally must have
received a notice of right-to-sue letter from the Equal
Employment Opportunity Commission ("EEOC").

_____    Age Discrimination in Employment Act of 1967, 29 U.S.C. §§ 621 et seq., for employment discrimination against persons age 40 and over, or retaliation for exercising rights under this statute.

> **NOTE**: To sue under the Age Discrimination in Employment Act, you generally must first file a charge of discrimination with the EEOC.

_____    Americans With Disabilities Act of 1990, 42 U.S.C. §§ 12101 et seq., for employment discrimination on the basis of disability, or retaliation for exercising rights under this statute.

> **NOTE**: To sue under the Americans With Disabilities Act, you generally must have received a notice of right-to-sue letter from the EEOC.

_____    Other (describe) _____    _____

_____

_____

_____

_____

_____

2.    This Court has subject matter jurisdiction over this case under the above-listed statutes and under 28 U.S.C. §§ 1331 and 1343.

## Parties

3.   Plaintiff.   Print your full name and mailing address below:

Name   TIUMANI S. MUTASA  NYAJEKA

Address   2130 Everitt Street, Apt. C.

Greensboro, N.C. 27401

4.   Defendant(s).   Print below the name and address of each defendant listed on page 1 of this form:

Name   THE INTERDENOMINATIONAL THEOLOGICAL CENTER/GANNON,

Address   700 Martin Luther King Jr. Drive

Atlanta, GA. 30314.

Name   _____

Address   _____

_____

Name   _____

Address   _____

_____

## Location and Time

5.   If the alleged discriminatory conduct occurred at a location different from the address provided for defendant(s), state where that discrimination occurred:

_____

_____

6.    When did the alleged discrimination occur?  (State date or time period)

_January 1996 — January 2015. School failed to Stop/exposed Me to Sexual Assault, Harassment, Intimidation, Stalking and Humiliation, Suffered Hostility and Discrimination January 1997 — 2015 --_

### Administrative Procedures

7.    Did you file a charge of discrimination against defendant(s) with the EEOC or any other federal agency?      ✓ Yes      _____ No

        If you checked "Yes," attach a copy of the charge to this complaint.

8.    Have you received a Notice of Right-to-Sue letter from the EEOC?

        ✓ Yes      _____ No

        If you checked "Yes," attach a copy of that letter to this complaint and state, the date on which you received that letter: _Feb. 17, 2015_  (Have been Ill. Please See Medical Records.)

9.    If you are suing for **age discrimination**, check one of the following:

        _____        60 days or more have elapsed since I filed my charge of age discrimination with the EEOC

        _____        Less than 60 days have passed since I filed my charge of age discrimination with the EEOC

Page 4 of 9

10.  If you were employed by an agency of the State of Georgia or unsuccessfully sought employment with a State agency, did you file a complaint against defendant(s) with the Georgia Commission on Equal Opportunity?

_____ Yes        ✓ No        _____ Not applicable, because I was not an employee of, or applicant with, a State agency.

If you checked "Yes," attach a copy of the complaint you filed with the Georgia Commission on Equal Opportunity and describe below what happened with it (i.e., the complaint was dismissed, there was a hearing before a special master, or there was an appeal to Superior Court):

_____

_____

_____

_____

11.  If you were employed by a Federal agency or unsuccessfully sought employment with a Federal agency, did you complete the administrative process established by that agency for persons alleging denial of equal employment opportunity?

_____ Yes        ✓ No        _____ Not applicable, because I was not an employee of, or applicant with, a Federal agency.

If you checked "Yes," describe below what happened in that administrative process:

_____

_____

_____

_____

**Nature of the Case**

12.    The conduct complained about in this lawsuit involves (check only those that apply):

_____          failure to hire me
_____          failure to promote me
_____          demotion
✓          reduction in my wages
✓          working under terms and conditions of employment that differed
               from similarly situated employees
✓          harassment
✓          retaliation
_____          termination of my employment
               failure to accommodate my disability
✓          other (please specify) Failure to Stop
               Sexual Assault, Harassment, Discrimation, Resulting in
               Permanent Illness.

13.    I believe that I was discriminated against because of (check only those that apply):

_____          my race or color, which is _____ _____ _____
_____          my religion, which is _____
✓          my sex (gender), which is _____ male ✓ female
✓          my national origin, which is ZIMBABWE, SOUTHERN AFRICA
_____          my age (my date of birth is _____)
_____          my disability or perceived disability, which is:

               _____

_____          my opposition to a practice of my employer that I believe violated
               the federal anti-discrimination laws or my participation in an
               EEOC investigation

_____          other (please specify) FEMALE IMMIGRANT,
               OF AFRICAN ORIGIN/GENDER DISCRIMINATION/VIOLENCE
               NOT STOPPED

14.  Write below, as clearly as possible, the essential facts of your claim(s).
     Describe specifically the conduct that you believe was discriminatory or
     retaliatory and how each defendant was involved. Include any facts which
     show that the actions you are complaining about were discriminatory or
     retaliatory. Take time to organize your statements; you may use numbered
     paragraphs if you find that helpful. Do not make legal arguments or cite cases
     or statutes.  Please See Cover Letter (4pgs)

(Attach no more than five additional sheets if necessary; type or write legibly only on
one side of a page.)

Page 7 of 9

15.  Plaintiff  _____  still works for defendant(s)
                 _____  no longer works for defendant(s) or was not hired

16.  If this is a disability-related claim, did defendant(s)/deny a request for
     reasonable accommodation?  _____ Yes  √ No

          If you checked "Yes," please explain: _____

          _____

          _____

          _____

          _____

17.  If your case goes to trial, it will be heard by a judge unless you elect a jury
     trial. Do you request a jury trial?  _____ Yes  √ No

## Request for Relief

As relief from the allegations of discrimination and/or retaliation stated above,
plaintiff prays that the Court grant the following relief (check any that apply):

_____        Defendant(s) be directed to _____

             _____

√            Money damages (list amounts) _____

             _____

_____        Costs and fees involved in litigating this case

(√           Such other relief as my be appropriate

## PLEASE READ BEFORE SIGNING THIS COMPLAINT

Before you sign this Complaint and file it with the Clerk, please review Rule 11 of the Federal Rules of Civil Procedure for a full description of your obligation of good faith in filing this Complaint and any motion or pleading in this Court, as well as the sanctions that may be imposed by the Court when a litigant (whether plaintiff or defendant) violates the provisions of Rule 11. These sanctions may include an order directing you to pay part or all of the reasonable attorney's fees and other expenses incurred by the defendant(s). Finally, if the defendant(s) is the prevailing party in this lawsuit, costs (other than attorney's fees) may be imposed upon you under Federal Rule of Civil Procedure 54(d)(1).

Signed, this 27 day of June , 2021.

(Signature of plaintiff *pro se*)

Tumani S. Mutasa Nyajeti
(Printed name of plaintiff *pro se*)

2136 Everitt Street
(street address)

Greensboro, NC. 27401
(City, State, and zip code)

tmnyajeka@yahoo.com
(email address) stnyajet@Uncg.edu.

(336) 740-5360.
(telephone number)

*Mr. James N Hatten, Clerk of Court,*
*Richard B. Russell Federal Building,*
*2211 United States Courthouse,*
*75 Ted Turner Drive, SW.*
*Atlanta, GA. 30303-3309*

*June 23, 2021.*

*Seeking resolution to Sexual Assault, Harassment, Retaliation, Bullying,  Intimidation,*
*Workplace Injury, Discrimination, and Wrongful Termination Claims from Employer.*

*Dear Sir,*
After review of my unresolved legal situation due to illness the Attorneys at Deuterman Law
Group (stephanie.bullard@deutermanlaw.com) and Seth Cohen (336.274.2992) Greensboro,
NC, advised me to file a case in Federal Court in Atlanta, Georgia, against my employer, The
Interdenominational Theological Center, a Graduate School, for Sexual Abuse, Assault,
Harassment, Stalking, Bullying, Intimidation, Retaliation, Discrimination, Loss of Employment
and Workplace Injury. For fifteen years the school failed to protect me from Sexual Harassment,
Assault, Stalking and Bullying choosing instead to consistently promote the faculty colleague
into various powerful Supervisory positions with knowledge on his escalating violence against
me. In these Supervisory positions the colleague as Associate Academic Dean (***Dr. T. Mafico***),
would engage in various violent retaliatory acts to humiliate me but ultimately orchestrated my
loss of employment in his position as Interim Dean. I also lost my health, a home, all earnings,
professional opportunities, and Community. I am kindly asking the Court to assist in recovering
all losses as I continue to  experience extreme difficulty in continuing treatment,therapy and
keeping shelter and paying medical bills.(Please see ***EEOC Letter. 2013 Terry***
***Tollefson***,Investigator,  and Mr.Salazar.Claims Summary.2015; any relevant material in Folder).
***Sexual Harassment, Office of Academic Dean. and Loss of Georgia Department of Labor***
***Certification:***
For almost ten years I worked in a state of 'virtual' servitude as the school 'held' my immigration
papers preventing me from engaging my own lawyer and blocking any options to seek
employment elsewhere in the United States. After the school's 'holding' of these papers this
long the ***Georgia Department Labor Certification*** mysteriously vanished/disappeared whilst in
custody of the Academic Dean (***Dr. T. Mafico***/Associate and ***Dr. E. Wimberley***). My immigration
status was a constant source of bullying, intimidation and discrimination as I would be denied
access to sign up for Retirement and Pension Benefits, Equitable Salary, Sabbatical requests,
Severance pay, and subjected to harsh treatment and intimidation when seeking any
opportunities for professional growth. (***Witnesses***: *Dr. Michael Battle*, President/ITC 2004;
Attorney ***Lu Wang***.2004).
Years of bullying, sexual harassment and a sudden loss of employment resulted in sudden
illness, several hospitalizations and a clinical diagnosis of mental health disorders related to
work-place violence.( Salazar 2015 Letter; ***EEOC Determination 2013***; Association of

Theological Schools *ATS Finding. La Rue/email 2016*; Dr. Ewing.Director of Foundation-email and conversation.2017; *Medical Records*.( Please see documents in folder):

### I.   *Sexual Assault and Harassment and Work-Related Illness:*
 After rejecting several sexual advances, and surviving an assault from a colleague (*Dr. T. Mafico, Harvard.Ph.D)*, the school promoted him to several powerful Supervisory positions and Search Committees with knowledge and information of this history of sexual aggression and violence towards me. I arbitrarily lost my employment soon after he was appointed Interim Academic Dean.Years of unchecked sexual violence, unpovoked attacks, discrimination and loss of employment resulted in unexpected illness.
I have been hospitalized three times within the last six years, and been clinically diagnosed with Work-related mental disorders as: *Depression, Anxiety, Expressive Aphasia, and PTSD* (Episodes-coma, psychosis/needing restraint, suicidal), for which I am continuing therapy and treatment:
Kaiser Permanente Clinic visit (2011) fatigue, dizziness, problem operating vehicle; Anxiety and Fatigue.Diagnosis; Collapse/Trauma,Emergency Admission, Coma and Hospitalization, 2014 (5 days); 2017; (6 days). Episodes- coma, psychosis/suicidal, restrain (noted as danger to self/others), loss of speech, cognitive ability, and mortar skills. Diagnosis Workplace Trauma/Injury. Evans-Blount Clinic, Greensboro NC. 2014; James Austin Health Center, Eden, NC; Carter Care Center, Greensboro,NC. 2014;  Murambi Garden Clinic 2014; Wesley Long Hospital. 2018. OARS Office (student), UNCG. 2020.( Please see Medical Records).

### II.   *Interference, Intimidation and Stalking:*
I would also like for the Court to know that between 2012-14, the school administration engaged in a pattern of 'continued stalking' activities interfering with my efforts at seeking employment. For example, in 2012-13, the  school engaged in activities which blocked an opportunity for a new position/employment offer (at the point of signing a contract) with a University in Japan (2012-2013), *Witnesses*: Dr. HiRho Park, hirhopark@gbhm.org; sawamura@gaines.hju.ac.jp, Japan; Dr. Ken Yamada.US.); And in 2014 Similar activities occurred at another University (Witness: Dr. Ewing. Junaluska.email). As a victim subjected to a pattern of stalking, intimidation and threats of sexual assault and harassment, or on account of Immigration status whose requests to stop the abuse were ignored I was traumatized and always felt powerless. For example, in 2005, Dean Wimberley, told me to be 'silent' to the fact that the *Search Committee* (led by *Dr. T. Mafico*), was verbally assaulting, stalking, humiliating, and harassed me during a long interview process (*4 years*) for the Chair. Otherwise, he warned, 'any complaint or mention of this violent interviewing experience to anyone would ruin my professional reputation making it impossible to be hired anywhere else in Academia.'(2001-2005); (*Witnesses*: Dr. Hiro Park, hirhopark@gbhm.org; sawamura@gaines.hju.ac.jp, Japan.; Dr. Walter McHelvey/Gammon. President.;  Dr. Ken. Yamada. General Board of Higher Education and Ministry.( GBGHM). UMC. US.)

### III.   A graduate of *Northwestern (Ph.D) and Duke (Master's) Universities, Birmingham-Southern College and University of Zimbabwe (BA)*, I have been a

recipient of many **Academic Honors and Awards** such as, the **American of Association University Women's International Peace Fellow Award**; **Lilly Foundation Chair**, Visiting Professor, **Berea College**; Adjunct Professor of World Religion, **Spelman College** and **Dillard University;** Visiting Lecturer, **Emory University**; **Ford Foundation Fellow**, Visiting Professor/Womanist Scholar, **University of South Africa**; **Dorothye and Cornelius Henderson**, **E. Stanley Jones Chair** of Evangelism, **Gammon/ITC**; **James M Walker, Chair,** Africa University. I have never been cited for poor performance or found in violation of any professional standard; All **Peer Faculty Reviews and Student Evaluations** are of the highest quality on File in all Colleges and Universities taught. As testimony to effort, hard work, sacrifice, as well as a positive attitude in appreciation of others' support as colleagues, students and communities, I am not only a published scholar whose work is highly appreciated worldwide, but also achieved the academic status of **Full Professor**.(Please see material enclosed). I am a pioneering (woman) **Ordained Elder** in good standing in the **United Methodist Church**.( Dr. Larcey Warner, **Duke University** 2005-2014. Colleague in E. Stanley Jones Chair. Female).

A member of **St. John UMC, Eden, N. Carolina**, am also currently enrolled as a Graduate student in the **Peace and Conflict Program** at the **University of North Carolina Greensboro** (as advised by Therapist); I am also a Facilitator and Peace Educator of a Women Refugees Group.

**IV.   Claims: Please see attached document 2015.**
Additional details:
   a) Outstanding Student Loan ; Medical Expenses and Continuing Treatment and Therapy
   b) Pain and Suffering

**V.   Witnesses:**
   1. **Nicholas Salazar: Attorney Letter on Case, 2015-17.**
   2. **EEOC Investigator: Terry Tollefson, 404.562.6970. Atlanta, GA. 2013.**
   3. **Association of Theological Schools: Lori Neff LaRue. nefflarue@ats.edu 2015**
   4. **Director of Foundation. Dr. J. Ewing. Email. 2017.**
   5. **Dr. M. Hale. Professor, Peace and Conflict Studies mrhale@uncg.edu**
   6. **Colleagues and other Administrators**:Dr. Michael Battle (President/ITC. via Linkedin.); Dr. Michael Franklin (President/ITC. Morehouse. via Linkedin) Ms. B Hall. Registrar. bhall@itc.edu;Dr. HiRo Park. hpark@gbhem.org (General Board of Higher Ed. and Ministry. UMC); Dr. C. McCrary. cmcrary@itc.edu (Dept. Chair ); Dr. H. Welchel. hwechel@itc.edu (Faculty Committee Chair);  Dr. Walter McKelvey, President/Gammon.; Dr. A. Pollard (Emory;Howard);Dr. J. Hopkins. jamalhopkins@juno.com ;J. Chastain, The Graduate School, Admissions.jkchastain@uncg.edu;  Professor M. Masenya. masenmj@unisa.ac.za (UNISA); Dean Dr. D. Jacobs (Turner); Dr. M. Rivage-Seul. peggy-rivage-seul@berea.edu ( Berea College); Dr. J. Grant (ITC); Dr. Larcey Warner ( Duke University, Chair Colleague); Professor L. Dube ldube@usfa.edu .(University of San Francisco); Sandra Thompson, Operations Manager, sandra@ascaafrica.org ;

*Academic Performance Records: Student and Peer Evaluation Files. President Matthew Williams/ITC. (Curent); Berea College; Gammon/ITC. Spelman College; Foundation For Evangelism Files/Gammon; Emails- Peer faculty, Elon University; President, Paine College.*
***Students Witnesses Available***: *Rev. Yvonne White*; *Riva Edmonds,* redmonds24@yahoo.com; *Ms. Deadra English; Rev. Beatrice Euzonebge* (US/Nigeria); Mr. Jude Louis (US/Haiti) ; *Rev. Derrick Rice; Sunika Washington* (Delta Airlines); Ilunga Mwepu.dikonzo@gmail.com.(please see email/in folder); (Many students); *Angie Sandiago,* UNCG; *Robert Goodson*. Linkedin: *Della Spearman*, dellaspearman@yahoo.com ; Godfrey Jankie, Lucas Mhere Mosata, AME. Botswana. Linkedin; *W. Tina Trice-Culpepper*. Linkedin;
***Family***: ***Daughter, (Educator)***.(Guilford County.Greensboro, NC); ***Daughter, (student)***. NCSU. ***Sister***. Chicago.IL.

## VI.     *Employer/School:Witnesses:  Sexual Assault/Harassment; Stalking; Bullying; Intimidation; Discrimination and Immigration Status Violence:*

1. ***Mr. Lu Wang, Attorney 2004-; EEOC. Investigator. Terry Tollefson***
2. *.**Dr. Wimberley, Academic Dean**.*Complicit. Documents,Concealed or Disappeared. Arbitrary Letter 'end of funding' employment Letter.(School Files)
3. ***Dr. Mafico. Interim Academic Dean***. Sexual Assault,Harasment, Bullying, Intimidation, Stalking, Humiliation (since 1997), Denied Internal Grievance Processes/ Cover up and Termination.
4. ***Dr. Haney, Faculty colleague,***  Immigration Status Bullying for the first ten years of my teaching at Gammon/ITC. (The first semester of teaching she called me to a 'confidential meeting' in her office and to my shock explained the purpose was to inquire why with Duke and Northwestern degrees I had chosen to teach Gammon/ITC, was it because I wanted to fix my papers/After expressing concern about the 'inquisitorial' meeting she divulged that Dr. S. Rasor (non-administrator), had requested her to pursue a question on my immigration status).
 Complicit-Sexual Harassment. Fabricated Letter to Dean and pilfered envelope from President's Office.
5. ***Dr. Peters, President***. Complicit. Ignored the Faculty Grievance Process stipulated in the Handbook as well as failed to honor Document protecting faculty rights from arbitrary action by Foundation as occurred in my case; Appointed ***Dr. T Mafico,*** Interim Academic Dean.
6. ***Dr. Rasor, Faculty colleague,*** Immigration Status Bullying (since 1998). Verbal assaults and threats on the position of Chair/Never shared he was neighbours and their children friends with Ms. Carolyn Harvick (Administrative Assistant in Office of School's Lawyers) would call verbalizing 'Deportation threats,' for no reason (1998), and somehow filed a wrong Petition Status with INS (2003) without my consent knowing a denial of Petition would have catastrophic consequences to my work and family stay in the United States. It was denied. Even after this illegal activity by its lawyer, the school and lawyers

continued to 'hold' my papers rejecting all requests to engage my own Immigration attorney.

7. **Dr. Jack Ewing, Director of Foundation,** 3 Campus Visits within a 4 year period; no purpose of visit stated. 2010 Classroom Visits in '**Violation of ATS Principles and Standards of Academic Freedom'**. Author of Letter to Gammon and Dr. Wimberley during Christmas Break of 2010. Openly shared that Dean Wimberly has a reputation of being a ruthless person (2018. See Email).

8. **Dr. Stephen Gunter, 13 Chairs Coordinator/Foundation,**. 2 Campus Visits within a 3-year period offering no stated purpose for visit without or ever showed he had visited any of other 12 Chairs as expected in his position.The second was a Classroom Visit (clandestinely requested over the phone/2week notice) in which he and Dr. J. Ewing (Director) openly announced the purpose of the visit to students as 'to introduce themselves and the Foundation and offer all support to the Professor (Dr. Nyajeka) in the Chair, as they paid my salary'. It was false. Appointed his 'colleague' to my position soon after the letter to Gammon. Appeared at the university I was teaching soon after my first hospitalization.

9. **Bishop Albert. Norris,Acting President/Gammon (2010**), Witness to Visits and recipient of Letter.(no copy given to the person in Chair).

10. **School Attorneys**: School and its Attorney have all Documents related to my case.(Please see email all documents the School and its Attorneys have on File).

**I am open to arbitration, meeting with a Judge, or trial of a case before a jury if recommended by the Judge.  Due to illness and inability to work I have failed to secure adequate funds for legal fees as demanded by lawyers to continue my case (Please see Chugh Law Firm, request for additional legal fees in Folder).**

**Sincerely,**
**Tumani Sheila Mutasa Nyajeka.**
**2130 Everitt Street. Apt C.**
**Greensboro, NC. 27401.**
**Email: tmyajeka@yahoo.com; stnyajek@uncg.edu (student).**

*2015 CLAIMS LETTER.*



## A.  Lost Earnings:

1. Pension benefits 1997-2006 (9 × $4,000.00) ....................................................$36,000.00

2. Equal pay for Chair and Professorship positions (5 × $38,500.00)........................$192,500.00

3. 2011/2012 outstanding academic year as Chair with equal pay under contract.................$85,000.00

4. Upcoming 2012/2013 sabbatical at UNISA (as earned)................................................$115,000.00

5. Lost Earnings for academic years 2013/2014 through 2015/2016; (3 × $85,000.00).............$255,000.00

6. Teaching during Summer semesters for years 2012 through 2015; (4 × $5,500.00)................$20,000.00

7. Personal library lost in office through lack of access. ..............................................$5,000.00

**Total Lost Earnings ...............................................................................$708,500.00**

## B.  Personal Damages:

1. Relocation expense to Zimbabwe and back to U.S..................................................$35,000.00

2. Medical treatment for depression and psychological trauma.........................................$6,500.00

3. Loss of 2000 Volvo through repossession ..........................................................$5,000.00

5. Loss of residential home ......................................................................$179,000.00

**Total Personal Losses..........................................................................$225,500.00**

**TOTAL DAMAGES: ...........................................................................$934,000.00**

= 1,200,000.00

We trust that upon carefully considering the above-stated facts, ITC will satisfy its outstanding obligations to Dr. Nyajeka under her employment agreement with ITC.  Therefore, based on all of the above facts and claims, we demand that ITC remit to Dr. Nyajeka's counsel within 30 days of receipt of this letter, payment in the amount of **One Million Two Hundred Thousand Dollars ($1,200,000.00)** for all of Dr. Nyajeka's lost wages and damages.  Furthermore, we demand that ITC cease using Dr. Nyajeka's likeness in any and all ITC publications, printed materials, and online publications, and remove all likeness from ITC's materials.  Should you fail to comply with this demand letter, we will be forced to

EEOC Form 161-B (11/09)

## U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

## NOTICE OF RIGHT TO SUE *(ISSUED ON REQUEST)*

| To: | Tumani Nyajeka<br>5846 Cobalt Drive<br>Powder Springs, GA 30127 | From: | Atlanta District Office<br>100 Alabama Street, S.W.<br>Suite 4R30<br>Atlanta, GA 30303 |
|---|---|---|---|

☐ On behalf of person(s) aggrieved whose identity is
CONFIDENTIAL (29 CFR §1601.7(a))

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| 410-2012-01237 | Terry Tollefson,<br>Investigator | (404) 562-6970 |

*(See also the additional information enclosed with this form.)*

NOTICE TO THE PERSON AGGRIEVED:

Title VII of the Civil Rights Act of 1964, the Americans with Disabilities Act (ADA), or the Genetic Information Nondiscrimination Act (GINA): This is your Notice of Right to Sue, issued under Title VII, the ADA or GINA based on the above-numbered charge. It has been issued at your request. Your lawsuit under Title VII, the ADA or GINA must be filed in a federal or state court <u>WITHIN 90 DAYS</u> of your receipt of this notice; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a claim under state law may be different.)

[X] More than 180 days have passed since the filing of this charge.

☐ Less than 180 days have passed since the filing of this charge, but I have determined that it is unlikely that the EEOC will be able to complete its administrative processing within 180 days from the filing of this charge.

[X] The EEOC is terminating its processing of this charge.

☐ The EEOC will continue to process this charge.

Age Discrimination in Employment Act (ADEA): You may sue under the ADEA at any time from 60 days after the charge was filed until 90 days after you receive notice that we have completed action on the charge. In this regard, the paragraph marked below applies to your case:

☐ The EEOC is closing your case. Therefore, your lawsuit under the ADEA must be filed in federal or state court <u>WITHIN 90 DAYS</u> of your receipt of this Notice. Otherwise, your right to sue based on the above-numbered charge will be lost.

☐ The EEOC is continuing its handling of your ADEA case. However, if 60 days have passed since the filing of the charge, you may file suit in federal or state court under the ADEA at this time.

Equal Pay Act (EPA): You already have the right to sue under the EPA (filing an EEOC charge is not required.) EPA suits must be brought in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that backpay due for any violations that occurred <u>more than 2 years (3 years)</u> before you file suit may not be collectible.

If you file suit, based on this charge, please send a copy of your court complaint to this office.

On behalf of the Commission

*Bernice Williams-Kimbrough,*
*District Director*

FEB 1 2 2013
*(Date Mailed)*

Enclosures(s)

cc:   Joshua I. Bosin, Esq
      Holland & Knight
      1201 West Peachtree Street
      Suite 2000
      Atlanta, GA 30309

      Bobby Aniekwu, Esq
      BOBBY C. ANIEKWU & ASSOCIATES
      Suite 1330 The Candler Building
      127 Peachtree Street, NE
      Atlanta, GA 30303



# Northwestern University

ON RECOMMENDATION OF THE FACULTY OF

## THE GRADUATE SCHOOL

NORTHWESTERN UNIVERSITY HAS CONFERRED THE DEGREE OF

## DOCTOR OF PHILOSOPHY

UPON

## TUMANI S. MUTASA NYAJEKA

WHO HAS HONORABLY FULFILLED ALL THE REQUIREMENTS PRESCRIBED
BY THE UNIVERSITY FOR THAT DEGREE

GIVEN THIS FOURTEENTH DAY OF JUNE IN THE
YEAR NINETEEN HUNDRED AND NINETY-SIX A.D.



CHAIRMAN OF THE BOARD OF TRUSTEES

SECRETARY OF THE BOARD OF TRUSTEES

PRESIDENT OF THE UNIVERSITY

Teresa K. Woodruff
DEAN

Summary Of Today's Visit-04434-TWT   Document 1-1   Filed 10/30/20   Page 8 of 64   Page 1 of 2

 **James Austin Health Center**

# Summary of Today's Visit
**NYAJEKA , SHEILA T  DOB:10/24/1955**
**Account No 9371**
**Gender:Female**
**Race:Black or African American**
**Ethnicity:Not Hispanic or Latino**
**Preferred Language:English**
**02/19/2018 visit with Joanna L Carter, NP**

## Reason for Visit
- F/u BH

## Vitals
- Temp 98.3 (F)
- Pain scale 0 (1-10)
- HR 70 (/min)
- BP 124/68 (mm Hg)
- RR 18 (/min)
- Wt 133.4 (lbs)
- BMI 24.40 (Index)
- Ht 62 (in)
- Oxygen sat % 97 (%)
- Ht-cm 157.48 (cm)
- Wt-kg 60.51 (kg)

## Allergies
- N.K.D.A.

## Today's Diagnoses Include
- F43.10  PTSD (post-traumatic stress disorder)
- E55.9   Vitamin D deficiency
- Z87.898 History of syncope
- Z87.898 History of aphasia

## Medication List
- Start Aspirin EC Low Dose : 81 MG 1 tablet Orally once a day,30 day(s) ,30 ,Refills: 11

**Other medications you are on**
- Taking Ibuprofen : 800 MG 1 tablet with food or milk as needed Orally May take q 8 hours prn onset of headache.,30 days ,90 ,Refills: 1 (for: Encounter for general medical examination)
- Taking Vitamin D (Ergocalciferol) : 50000 UNIT 1 capsule Orally once weekly (on Friday's),90 days ,12 ,Refills: 0

Summary of Today's Visit for - NYAJEKA , SHEILA T  DOB:10/24/1955  Account No: 9371
**Rockingham Co Healthcare Alliance   518 S Van Buren Rd  Eden, NC 272885033   336-623-7711**
*Summary generated by eClinicalWorks (www.eclinicalworks.com)*
This document contains confidential information about your health. To maintain your privacy, do not throw this document in the trash. If you do not wish to keep this document for your records, please shred or otherwise securely dispose of your copy. If you are not the intended recipient, please destroy this document and report it to the physician's office named above.

 **James Austin Health Center**

# Summary of Today's Visit
### NYAJEKA , SHEILA   DOB:10/24/1955
### Account No 9371
### Gender:Female
### Race:Black or African American
### Ethnicity:Not Hispanic or Latino
### Preferred Language:English
### 11/08/2018 visit with Jason Vaughn, NP

## Allergies
• N.K.D.A.

## Today's Diagnoses Include
• F41.8    Depression with anxiety
• R51      Nonintractable episodic headache, unspecified headache type
• E78.5    Hyperlipidemia, unspecified hyperlipidemia type

## Medication List
• Refill Ibuprofen : 800 MG 1 tablet with food or milk as needed Orally May take q 8 hours prn onset of headache.,30 ,90 Tablet ,Refills: 1

**Other medications you are on**
• Taking Aspirin EC Low Dose : 81 MG 1 tablet Orally once a day,30 day(s) ,30 ,Refills: 11
• Taking Atorvastatin Calcium : 20 MG 1 tablet Orally once a day,30 day(s) ,30 ,Refills: 5
• Taking Vitamin D3 : 2000 UNIT 1 capsule Orally once a day,30 day(s) ,30 ,Refills: 11
• Taking Ibuprofen : 200 MG 1 tablet as needed Orally every 6 hrs
• Discontinued Vitamin D (Ergocalciferol) : 50000 UNIT 1 capsule Orally once weekly (on Friday's),90 days ,12 ,Refills: 0

## Other Medical Conditions (Problem List)
• F41.8    Depression with anxiety
• R51      Nonintractable episodic headache, unspecified headache type
• F43.10   PTSD (post-traumatic stress disorder)
• E55.9    Vitamin D deficiency
• E78.5    Hyperlipidemia, unspecified hyperlipidemia type

## Your Next Appointment(s)
• Mon, 28 Jan 2019 at 02:00 PM with Jason Vaughn, NP at Rockingham Co Healthcare Alliance 518 S Van Buren Rd Ste 1 Eden, NC 272885033 Phone: 336-623-7711

Summary of Today's Visit for - NYAJEKA , SHEILA   DOB:10/24/1955 Account No: 9371
**Rockingham Co Healthcare Alliance   518 S Van Buren Rd Eden, NC 272885033   336-623-7711**
*Summary generated by eClinicalWorks (www.eclinicalworks.com)*
*This document contains confidential information about your health. To maintain your privacy, do not throw this document in the trash. If you do not wish to keep this document for your records, please shred or otherwise securely dispose of your copy. If you are not the intended recipient, please destroy this document and report it to the physician's office named above.*

Notes:
Will attempt to get approval for the carotid doppler and echocardiogram which was ordered while you were in africa 12/17. You may begin taking Asprin 81mg daily. I will send in the Asprin today to your pharmacy. Since you do not want to start the atorvastatin they recommended, we will recheck your level as planned in April and disscuss it further at that time. Follow recommended diet. When you feel that you are ready for a screening colonoscopy and PAP smear, please let us know. (for: PTSD (post-traumatic stress disorder))

## Other Medical Conditions (Problem List)

- F41.8    Depression with anxiety
- R51      Nonintractable episodic headache, unspecified headache type
- F43.10   PTSD (post-traumatic stress disorder)
- E55.9    Vitamin D deficiency

## Smoking Status

- nonsmoker

## Your Next Appointment(s)

- Thu, 19 Apr 2018 at 09:30 AM with Joanna L Carter, NP at Rockingham Co Healthcare Alliance 518 S Van Buren Rd Ste 1 Eden, NC 272885033 Phone: 336-623-7711

---

Summary of Today's Visit for - NYAJEKA , SHEILA T  DOB:10/24/1955  Account No: 9371
**Rockingham Co Healthcare Alliance    518 S Van Buren Rd Eden, NC 272885033    336-623-7711**
*Summary generated by eClinicalWorks (www.eclinicalworks.com)*
*This document contains confidential information about your health. To maintain your privacy, do not throw this document in the trash. If you do not wish to keep this document for your records, please shred or otherwise securely dispose of your copy. If you are not the intended recipient, please destroy this document and report it to the physician's office named above.*

Fax 336 623-7713

Llathrum@rchealth.org

Leslie Lathrum



**Carter's**
Circle of Care
*"Getting to the root of the problem."*

### 2031-E Martin Luther King, Jr. Drive
### Greensboro, NC 27406

Client Name: __Tumani Nyajeker__   DOB: __10/24/55__   Record #: _____

### Review of Assessment Results

☑ Reviewed diagnosis with consumer/guardian.
☑ Discussed treatment recommendations and intensity of service with consumer/guardian.
☑ Consumer/Guardian acknowledges need for treatment and expresses willingness to participate in recommended services with CCOC.
☐ Consumer/Guardian will be referred to another provider for some or all recommended services.

<u>Consumer/Guardian responses:</u>

_____   M.S/EdS, LPCA          _____
Assessor Signature & Credentials                              Date

_____   _____
Supervisor Signature & Credentials (if applicable)            Date

_____   _____
Other Signature, Credentials, Position  (if applicable)       Date

***********************************************

### Interdisciplinary Team Note

I have reviewed and discussed this Diagnostic Assessment with the Interdisciplinary Team. I concur with the diagnosis and treatment recommendations.

_____          _____
Signature of MD, DO, PA, FNP or PhD in Psychology              Date

_____
Printed Name

CONFIDENTIAL          COPY

Assessment (Electronic Version)

Case 1:20-cv-04434-TWT   Document 1-1   Filed 10/30/20   Page 2 of 5

**Piedmont Triad Ambulance & Rescue Inc.**
PO BOX 534
HIGH POINT, NC 27261

IF PAYING BY VISA, MASTERCARD, DISCOVER OR AMERICAN EXPRESS, FILL OUT BELOW

☐ VISA   ☐ MASTERCARD   ☐ DISCOVER   ☐ AMER. EXP.

CARD NUMBER                              EXP. DATE        AMOUNT

SIGNATURE                               MUST INCLUDE 3 OR 4 DIGIT
                                        SECURITY CODE FROM FRONT
                                        (AMER. EXP) OR BACK OF CARD

For all billing questions, call: 336-887-3411
Office Hours: Monday-Friday 8:00AM-5:00PM
Website: www.ptarinc.com
Tax ID: 23-7160139
**Patient Name: SHEILA TUMANI NYAJEAKA**

| STATEMENT DATE | PAY THIS AMOUNT | ACCOUNT NO. |
|---|---|---|
| 09/12/18 | $553.45 | 18-6200 |

CHARGES AND CREDITS MADE AFTER STATEMENT
DATE WILL APPEAR ON NEXT STATEMENT.

SHOW AMOUNT $
PAID HERE

━━━━ MAKE CHECKS PAYABLE / REMIT TO: ━━━━

SHEILA TUMANI NYAJEAKA          136678-1326
1046 HILL ST
GREENSBORO NC  27408-8418

010396

Piedmont Triad Ambulance & Rescue Inc.
PO BOX 534
HIGH POINT, NC 27261

☐ Please check box if above address is incorrect or insurance
information has changed, and indicate change(s) on reverse side.

**STATEMENT**

PLEASE DETACH AND RETURN TOP PORTION WITH
YOUR PAYMENT IN ENCLOSED ENVELOPE

| Procedure Code | Description | Quantity | Payer | Amount | Contractual Allowance | Balance |
|---|---|---|---|---|---|---|
| A0429 | GUILFORD BLS-E | 1 | | $523.59 | $0.00 | $523.59 |
| A0425 | GUILFORD MILEAGE | 2.7 | | $29.86 | $0.00 | $29.86 |

| | |
|---|---|
| **TOTAL DUE** | |
| $553.45 | |

This balance is now 30 days past due and needs your attention.
If you have questions about this balance or need to set up a
payment plan, please contact our office immediately. Thank
you!

**Date Of Service:** 03-04-2018
**Incident Number:** 22030402
**Trip Date:** 03-04-2018
**Transport From:** 1046 HILL ST, GREENSBORO, NC
27401-0000
**Transport To:** Wesley Long Community Hospital
**Tax ID:** 23-7160139

1 of 1

**STATEMENT**
SEE REVERSE SIDE FOR IMPORTANT BILLING INFORMATION



136678 - 1326

From    **Beth C. Kincaid, MED,NCC,LPC,PLLC**
301 South Elm Street Suite 311
Greensboro, NC 27401



# Invoice

To    **TUMANI NYAJEKA**
3160 NORTH ELM STREET APT 22H
GREENSBORO, NC 27408

Invoice | #4397
Issue Date | 02/10/2020

Client | **TUMANI NYAJEKA**

(336) 740-5360
STNYAJEK@UNCG.EDU

Provider | BETH C. KINCAID MEd,
NCC, LPC
Tax ID: 82-2940893
NPI: #1962454330

(336) 450-0606
Bck@bethckincaid.com

| Date | Description | Amount |
|------|-------------|--------|
| 12/18/2019 | Psychiatric Diagnostic Evaluation  (First office visit) (90791) | **$102.78** |
| 01/06/2020 | Psychotherapy, 60 min (regular office visit) (90837) | **$82.78** |
| 02/10/2020 | LATE CANCELLATION (12) | **$0** |

**Total**    **$185.56**

Make payments to: Beth C. Kincaid, MED,NCC,LPC,PLLC

Thanks in advance for your payment!



**UNC GREENSBORO**
Division of Student Affairs
**Office of Accessibility
Resources & Services**

215 Elliott University Center
PO Box 26170, Greensboro, NC 27402-6170
Phone: 336.334.5440  Fax: 336.334.4412
web: oars.uncg.edu

**Student Copy**

## *CONFIDENTIAL*
## REQUEST FOR ACADEMIC ACCOMMODATIONS

TO:    UNCG Faculty

DATE: October 1, 2019

RE: Fall 2019 Accommodations for Tumani S. Nyajeka (883211887)

Tumani is enrolled in your course and has requested academic accommodations due to a disability. This letter is provided to inform you of reasonable accommodations that the Office of Accessibility Resources and Services (OARS) has approved for this student based on a thorough review of current documentation. These accommodations are intended to maximize the student's participation and success in your course and minimize barriers created by the disability. They should not be interpreted as an alteration of academic standards.

| CLASSROOM ACCOMMODATIONS | TESTING ACCOMMODATIONS |
|---|---|
| ☐ Taped Lectures | ☐ Extended Time (1.5x) |
| ☐ Note Taking (Smart Pen) | ☐ Reduced Distraction Setting |
| ☐ Sign Language Interpreters | ☐ Assistive Technology (varies) |
| ☐ Assistive Listening Device | ☐ Reader |
| ☐ Preferential Seating (Front of classroom) | ☐ Scribe |
| ☒ Other: Please offer consideration of assignment due dates due to disability. | ☐ Electronic Spell Checker* |
| ☒ Other: Please allow student to stand or take short breaks during class as needed. | ☐ 4-Function Calculator* |
| | ☐ Other: |

*Please contact OARS if this accommodation will compromise an essential function of this course.

The implementation of academic accommodations is a shared responsibility between the student, professor, and OARS. Please discuss each requested accommodation and how it will be implemented so that it is appropriate to both the student's needs and the format of your course. If you have any questions or need further assistance, please feel free to contact me at 334-5751 k_washin@uncg.edu.

Thank you for assisting us in providing equal access and opportunity for all students.

Student Signature: _____    Date: _____

OARS Staff: _____    Date: 10/1/19
Kadejia Washington, Assistant Director

**PLEASE SEE REVERSE SIDE FOR INFORMATION ON THE NEW TESTING ACCOMMODATION PROCEDURE.**

# ACCOMMODATIVE TEST POLICIES & PROCEDURES FOR FACULTY

Accommodations should permit equal access to the curricula while maintaining course integrity. They should not compromise course goals, critical knowledge, or academic performance standards. **Faculty should hold students with disabilities to the same academic standards as those without disabilities.** Faculty are encouraged to access the OARS website at oars.uncg.edu for further information and resources or contact the office with questions or concerns.

- **It is preferable that instructors proctor tests for students**. However, students who wish to take a test in OARS must complete an online testing accommodations form (for each test) at least seven (7) days prior to the date of the test. In the event a **student does not schedule to have their test proctored by OARS at least seven (7) days prior to the date of the test,** (as indicated on their course syllabus/or as announced by their instructor), **the test must be scheduled to be proctored by their instructor.** Instructors may contact OARS with questions concerning how to provide test accommodations. **\*Please note that tests are proctored in the OARS office Monday - Friday from 8am to 5pm ONLY.\***

- **In extenuating circumstances**, per an instructor's written request, OARS **may** decide to proctor a test that is scheduled after the seven (7) day window as a courtesy to the instructor. OARS's decision to proctor late test requests will be made on a **case by case basis** and will be determined based on such factors as; the ability to retrieve the test in a reasonable amount of time, availability of staff, testing space, and needed access to adaptive technology. **OARS cannot guarantee that late test requests can be honored and proctored by OARS.**

- In the event OARS decides to proctor a late test request as a courtesy to an instructor, the instructor may be asked to consent to allowing OARS to proctor the test at a later/earlier date or time than when the test is being given to the class due to spacing and staff considerations. This may be the case during midterms or finals week. **If an instructor does not find this to be a satisfactory arrangement, he or she will proctor the exam.**

- In the event a student arrives late by 30 minutes or more from the confirmed start time, they must obtain permission from the professor to begin the test and/or may have to reschedule for another day and time. The student must determine if they can finish the test in the time remaining before they start the test. If rescheduled the instructor must then notify OARS.

- It is important that instructors approve/confirm test requests submitted by students as soon as possible. Please include; how OARS will receive the exam, what materials (if any) the student is allowed to have during the test, how much time the class has to take the exam, and how the exam should be returned.

- Instructors need to notify OARS directly of any changes to the time or date of a test. This should be done by email or by phone. **It is not sufficient to relay messages concerning test changes via the student.**

- If OARS has approved a student for extended test time, OARS will **ONLY** allow the amount of extended time stated in the faculty accommodations letter. In the event that an instructor allows a student more time for tests than what is stated in the faculty letter, the student must make arrangements directly with the instructor to have the test proctored because this is an agreement with the instructor; **NOT** an accommodation.

## STATEMENT

This is a statement for professional services rendered by your physician. You may receive a separate bill from the hospital for its services.

| PATIENT NAME |
| --- |
| NYAJEKA, SHEILA |

| BILL DATE | ACCOUNT NO. | AMOUNT PAID |
| --- | --- | --- |
| 08/30/2019 | 9371 | |

THIS IS A STATEMENT OF SERVICES RENDERED BY PHYSICIAN(S) WHO ARE MEMBERS OF:

Rockingham Co Healthcare Alliance

518 S Van Buren Rd

Ste 1

Eden, NC 272885033

336-623-7711

NYAJEKA, SHEILA

3100 N ELM ST

GREENSBORO NC 27408-8418

| DATE OF SERVICE | DESCRIPTION OF SERVICE | CHARGES | PMT/ADJ/ WITHHELD | AMOUNT |
| --- | --- | --- | --- | --- |
| 11/08/2018 | Claim:1240, Provider: Jason Vaughn, NP | | | |
| 11/08/2018 | Office Visit, Est Pt., Level 3 | 69.98 | | |
| 11/08/2018 | VENIPUNCT, ROUTINE* | 10.00 | | |
| 03/26/2019 | Medicaid of North Carolina/EDS Federal C Payment | | 0.00 | |
| 05/22/2019 | Medicaid of North Carolina/EDS Federal C Payment | | 0.00 | |
| | Your Balance Due On These Services... | | | 79.98 |

| | | | PAY THIS AMOUNT | |
| --- | --- | --- | --- | --- |
| 08/30/2019 | NYAJEKA, SHEILA | 9371 | | $79.98 |

MAKE CHECK PAYABLE TO :   Rockingham Co Healthcare Alliance

**IMPORTANT MESSAGE REGARDING YOUR ACCOUNT**

We are pleased to offer you the option of credit card payment. Please indicate your method below.

| Payment Method: | VISA | MASTER CARD | DISCOVER | AMEX | CHECK |
| --- | --- | --- | --- | --- | --- |
| Amount: | | | Exp. Date: | | |
| Credit Card No: | | | Date: | | |
| Signature: | | | CVV: | | |

Aug 30, 2019                                    1                                    4:06:50 PM

Telephone: 701555-7
Fax: 263-04-706627
Private Bag CY 198, Causeway
Zimbabwe



**ZIMBABWE**

Reference: N/rm/25/07/16
Parirenyatwa Group Of Hospitals
Mazoe Street
HARARE

19 June 2017

Delta Airlines
USA

### RE:  SHEILA NYAJEKA : AGE: 61 YEARS

This letter serves to inform you that Sheila Nyajeka was admitted at
Parirenyatwa Group of Hospitals, Harare, Zimbabwe from the 09th of June
to the 13th of June 2017. She is now fit to take a flight.

May you kindly assist her accordingly.

PARIRENYATWA GROUP OF
HOSPITALS
DIVISION OF MEDICINE
2017 -05- 19
P.O. BOX CY 198
CAUSEWAY, HARARE

Dr G Chitiyo
**CONSULTANT - PHYSICIAN**

PARIRENYATWA GROUP OF
HOSPITALS
SISTER-IN-CHARGE WARD C6
19
P.C.  OX CY 198
CAUSEV AY, HARARE

## OUT-PATIENT RECORD AND REVIEW CARD

Sheila T Nyyyeka     Number: 721925 1

Address:

|   | W | YES |
|---|---|-----|
|   | C | NO  |
|   | C |     |

DOA ±9/6/17

DOD -13/6/17

I certify that the person responsible for payment of fee-
*Pay certain S.................or less per month.
or
*Pays ....... more than S... ..... per month.
(*delete the inapplicable)

△ ? the absent —
Expressive Aphasis

Date 13/6/17   Signature B n C   Witness

| Date | Clinical notes and treatment | Stamp |
|------|------------------------------|-------|
|      | P.C |  |
|      | 1 slurred speech | |
|      | 2 difficulty walking 1/7 | |
|      | and Muscle pain | |
|      | # P C | |
|      | The patient was previously well | |
|      | and presented to his unit | |
|      | a days history of expressive | |
|      | aphasia associated with | |
|      | difficulty walking | |
|      | She had no features reductive | |
|      | the preceeding headache, no GIs) | |
|      | and no history of trauma, | |
|      | ? TIA | |
|      | O/E | |
|      | — This grade patient 37.1°C | |

£ 180

PLACE STICKERS HERE (4)   **MINISTRY OF HEALTH AND CHILD WELFARE - NATIONAL HEALTH LABORATORY**
**SERVICES REQUEST/REPORT**

Patient's name: Sheila T. Nyaeke          Nature of specimen: ...........................   Date: 12|6|17
Hospital No.: 721925  Age: 61  Sex: F  Race: .......   Examination required: ...........................
Doctor: ......Baffo............  Ward: C6   Clinical data: ...........................
Address report to be sent to: ...........................

●Address account to be sent to: ...........................
CHARGEABLE/NON-CHARGEABLE     Authority (if free): ...........................          Doctor's Signature

●Warning: This test will not be executed unless a full address to which an account can be sent is given.

LABORATORY USE ONLY
PARIRENYATWA GROUP OF
SPITALS
SISTER-IN-CHARGE  A  C6

E. Chocardography

tx:
21|E with
expressive aphasa
? cardioembolic stroke.

Date received:

Laboratory number: ...........................          Officer in charge.



DR. MAZVITA MACHINGA Ph. D
( PVO 18/2010)
Psychotherapist

P.O. Box 576                                    Phone: 0771 754 519
No. 3. 13ᵗʰ Avenue                             Email: mmazvi@yahoo.com
Morningside
Mutare, Zimbabwe

February 5 , 2015

Dear Dr . Akinjide - Obonyo

REF: **Tumani Nyajeka (59 year Female)**

Thank you for referring Tumani Nyajeka for counseling and psychotherapy. Ever since discharge from Murambi Gardens Clinic in December 2014 , Tumani has so far participated in three psychotherapy sessions. She reports feeling better after being overwhelmed and grappling with past and present painful experiences which are work-related. She feels she finally experienced a break down of functioning as she had been enduring continuing long term difficult and complex situations from her work place and has not been handling these emotionally painful encounters constructively.

**Mental Status Examination throughout the three sessions.**

**Orientation x5-** client conscious about time, place, and situation and about her life events.
**Mood and Affect-** client' affect and mood appropriate for the problem stated indicated by her expressions.
**Thought content-** the client is overwhelmed therefore desperate for the situation to change.

**Overall Clinical Assessment**

1. Client reported signs and symptoms which signify psychosomatic responses that originate from emotional and psychological stress, distorted thought patterns and work related pressure. Unfortunately . these emotional and psychological distress progress with physical symptoms, and can would have led to client 's biological system be compromised due to stress. ⟨illegible⟩ . Por
2. Poorly or inadequately managed work related stress has affected the client's health and, therefore, it's important the client practice regular stress management techniques and change the way she response to stressful situations.
3. Client has supportive husband and this helps in her recovery.

**Treatment plan**

1. Client to engage in 12 sessions of Cognitive Behavioral Therapy that helps her learn to recognize negative patterns of thought, change her thought patterns, and form habits that decrease unconstructive reactivity to stress.
2. Client to also go through stress management techniques, self- soothing and mindful activities. The goal of all these are to help client improve response to and managing of stressors in a manner that does not negatively impact her health.
3. Client needs to go through practical approach to problem-solving since she minimizes issues which later have devastating effect on her emotions and thought processes.

I thank you for this interdisciplinary collaboration.

Yours faithfully

Dr. Mazvita Machinga Ph.D
**Psychotherapist**

CC. Dr. Mutsemi

SHELA JUMANI MNAJEKA

**CONTINUATION SHEET** MURAMBI CLINIC.

MURAMBI GARDEN CLINIC/MUTARE. ZIM.

RECORDS: CONTACT: Ms. P. Jana
Sister in Charge

Admitted: 11/12/14 - 18/12/14.

Outpatient; 17/12/14 - 19/5/15

Thank you.

J. mne
12/6/14

Thank you, Dr Zufe.
Improve
results are generally better.
ROT more
Domperidone 1mg orally 3x daily
Continue Iv fluids

## CONTINUATION SHEET

I have came to her today expecting
she would be well enough for discharge.
I find her sitting in bed in
that yoga-pose (and her bright painted
nails showing). Her answers to my
usual questions amount to gibberish
She does not make sense. It suggests
an EXPRESSIVE DYSPHASIA.
This is quite a transformation because
she communicated lucidly yesterday.
Add ASA ½ tablet slowly.

Pulse 12/min
B ₛ₁ ₛ₂ ₛ₁
NO murmurs
Ett        lungs.

Diaphragm Surgical.

Ecg.        AP
Cxk

14/12/14  I am informed that she was
suicidal yesterday, and attempted to throw
herself out the window.
She is still struggling to collect her thoughts.
Unfortunately there are no specialist
psychiatric services in the province.
Kindly add

SHIELA TLIMANI NJAJEKA

## **CONTINUATION SHEET**

I will discuss with her husband again about the best way forward re if a very probably psychiatrist opinion in Harare.

APA

15/12/14

She appears to be more composed. certainly, the contents of her thoughts are more normal. But, she is shaky on her feet.

All things considered she will benefit from a discussion with Dr. Machinga

Dear Dr. Machinga,
I shall value your kind help in the further management of this good lady.
She is a professor at Africa University. She has a stable circle- working husband and has 3 children.
She was admitted here 4 days ago with vomiting and fever. Although her symptoms soon settled on symptomatic treatment her behaviour has raised alarm bells.
The day after admission she seemed to

## CONTINUATION SHEET

Some aggressiveness toward the nurses particularly when she was untidy. Scolded for her behaviour toward other patients. Two nights ago she tried to throw herself out of the window.

It is all rather disturbing. Yet, simple physical illness can sometimes throw such behaviour. Nevertheless, I feel she cannot be sent home before we can have the benefit of your professional nous.

She has been commenced on sulpiride 50mg 2x daily & ~~chlorpromazine 50mg 3x daily~~.

I thank you for your kind help

Yours sincerely

W. Thinjide—Bango

15 December, 2014 Patient showed thoughts without hesitation. Thank you for referring the patient for counselling. Patient's spent 45 minutes with the patient. Patient's attention normal, orientation X5. time, person, place, Structure and object. Thought content coherent and appropriate to mood and circumstances. Speech normal and fluent. Listened attentively to the therapist questions and responded thoughtfully. Speech has no evidence of clouded no impairment reflective

By SHIELA TUMANI NJAJEKA

## CONTINUATION SHEET

Noted was that patient has history of stressful work related issues that have been building up for a long time more than a year and this has led her to persistent, interfering and debilitating fatigue. Patient need cognitive behavioral therapy as soon as she is discharged. This will help her with positive stress management techniques. Encouraged to exercise self-care and rest whenever she needs it. Patient needs to work on anxiety, work related tension and intrusive uncomfortable memories after discharge from hospital. [signature] Psychotherapist (PKO 18/2010)

12/12/19 Thank you, Dr. Machinga. Your pertinent comment about stress-related difficulties at work are noted.
I will encourage her to take advantage of your kind offer for cognitive behavioral therapy.
Kindly call at my surgery for a formal referral letter.

[signature]

**Dr. A. P. Akinjide-Obonyo**
BSc. (Hons)(Manchester) MB, Ch.B,(Hons.)(Manchester) MRCP (London)
**Consultant Physician**

TELEPHONE:
SURGERY - 61077.
RESIDENCE - 219826

4 SECOND STREET
MUTARE
ZIMBABWE

17/12/14

Mrs Tunani MAJEKA
2.0.3 20/10/55
48, WALDORF COURT
MURAMBI, MUTARE

Dear Dr. Machinga,

I shall feel most grateful if you would kindly take this good lady under your wing. You will recall that you identified some work-related stress factors when I asked you to see her recently. I quite agree with you that through your good offices you will be able to help bring her back to normalcy.

Thank you for your kind help.

Yours sincerely,
H. Akinjide-Obonyo

---

**Dr. A. P. Akinjide-Obonyo**
BSc. (Hons)(Manchester) MB, Ch.B,(Hons.)(Manchester) MRCP (London)
**Consultant Physician**

TELEPHONE:
SURGERY - 61077.
RESIDENCE - 219826

Mrs. Tunani MAJEKA

<u>To Whom It May Concern</u>

The above named has been unwell since 19/01/15, and still recuperating from her current ailment. I have asked her to take next 4 weeks off her duty.

I remain,

Yours sincerely,
H. Akinjide-Obonyo

DR. A.P. AKINJIDE-OBONYO
BSc. (Hons) (Manchester), M.B., Ch.B. (Hons) (Manchester,
M.R.C.P. (London)
4 SECOND STREET, MUTARE
TELEPHONE 61077

## Fw: Forwarded 2 Documents; Sexual Harassment at Gammon/ITC.

Tumani Nyajeka <tmnyajeka@yahoo.com>

Thu 9/24/2020 2:08 PM

To: Ods00312Cpc <Ods00312Cpc@OfficeDepot.com>

[CAUTION: EXTERNAL SENDER]


----- Forwarded Message -----
From: Tumani Nyajeka <tmnyajeka@yahoo.com>
To: "Ods00312cpc@officedepot.com" <Ods00312cpc@officedepot.com>
Sent: Saturday, April 7, 2018, 11:21:35 AM EDT
Subject: Fw: Forwarded 2 Documents; Sexual Harassment at Gammon/ITC.


--- On Wed, 12/20/17, Tumani Nyajeka <tmnyajeka@yahoo.com> wrote:

> From: Tumani Nyajeka <tmnyajeka@yahoo.com>
> Subject: Forwarded 2 Documents; Sexual Harassment at Gammon/ITC.
> To: "neff@ats.edu" <neff@ats.edu>
> Date: Wednesday, December 20, 2017, 1:59 PM
> Lori,
> Good afternoon. I have wanted to follow up on
> your May 6, 2016, recommendation that I file a documented
> complaint for the record in regards to sexual assault and
> harassment at Gammon/ITC.
> I also hope you have been receiving some of the
> early 2017, social media cases I forwarded your way before
> the 'Holywood Avalanche'.
>
> Have a Merry Xmas and Happy New Year!
> In Christ,
> Tumani.

- SEXUAL ASSAULT AND HARASSMENT, GAMMON/ITC:

(ATS. COMPLAINT FOR THE RECORD). 2017 , eMail .


A TIMELINE. (UnEdited).


I. Sexual Assault and Harassment by Dr. Mafico. A Brief Summary.


1. In October of 1998, Dr. Temba Mafico, sexually assaulted me after a meeting in his office.

   1. After the shocking incident I would silently endure many forms of aggressive behavior and sexual advances from Dr. Mafico.

   2. Managing to repel his persistent aggression triggered resentment which left him unashamed to openly express angry and hostile in all matters of our professional interaction.

   3. In 2001, I mustered the courage and openly shared the 'shameful secret ' of being a victim of this escalating violence with Dr. Wimberly, as Dean; Dr. Haney as Area Chair; and Dr. Grant, as a colleague.

   4. Instead of addressing and protecting me from further violence I would be Dr. Wimberley, appointed Dr. Mafico to a powerful position of Associate Academic Dean, Gammon/ITC.

   5. In this position of power, Dr. Mafico, would openly terrorize me as I watched him resort to multiple tactics to either interfere or block all my efforts at accessing opportunities for professional growth. All complaints to Dean Wimberley, were ignored.

   6. In 2009, I would once again asked Dr. Wimberley, to address and stop Dr. Mafico 's network continued interference with my work, he instead advised me to turn the other cheek and 'be nice' to him.


II. Dr. Mafico and Non-Renewal of my Contract.


   7. In March 2011, in his capacity as the newly appointed Interim Academic Dean Dr. Mafico, gate crashed a meeting I had arranged to confidentially meet with Dr. Peters, the new President of ITC. regarding a 'three-sentenced non-renewal of contract' letter that had been personally written in January by Dr. E. P. Wimberley, as Dean of Gammon/ITC.

In this meeting Dr. Mafico, openly verbally assaulted and humiliated me by claiming he had 'brought me' to Gammon/ITC. This lie symbolized my condition of helplessness at the power Dr. Mafico, wielded using it to sexually terrorize and abuse me each time Gammon/ITC adminstration promoted him.

8.  In this poweful position of Interim EVP, GammonITC, Dr. Mafico, was allowed by administration to deny all my requests for an internal Grievance Process to review the non-renewal of contract which had been unilaterally written by Dr. E. Wimberley. Denial of an internal grievance process by the Acting Dean, would result in loss of employment within a three- month period.

9.  In July, 2011, Dr. Mafico, continued to exhibit his behavior of sexual harassment and intimidation through stalking me. For example, whilst teaching an evening Summer class Dr Mafico, without warning suddenly appeared, stood in the door-way for a while and walked away without saying a word. Since they had no idea of a certain side of his behavior towards me students in this class were left quite disturbed by the incident.(Dr. Battle, or Student witnesses to the incident available to verify stalking behavior directed at me).

10. Inspite of many requests and complaints seeking protection from Dr. Mafico's workplace sexual violence for 14 years, Gammon/ITC adminstration failed to hold him accountable creating a work environment that would guarantee safety and security.

11. In March 2011, Gammon/ITC appointed Dr. Mafico, to Acting Academic Dean, a Supervisory position he used to retaliate against my success at repelling all relentless forms of his sexual assaults and harassment from him.

12. Gammon/ITC,s failure to address extreme forms of sexual assaults and harassment from Dr. Mafico, as well as xenophobic violence from his 'friends ', Drs. M. Haney and S. Rasor interfered with and ended my work. I worked in a toxic and hostile workplace in which it became very difficult to leave for 14 years at ITC.

## Fw: (CONFIDENTIAL) SEXUAL ASSAULT AND HARASSMENT, GAMMON/ITC:

Tumani Nyajeka <tmnyajeka@yahoo.com>

Thu 9/24/2020 2:10 PM

To: Ods00312Cpc <Ods00312Cpc@OfficeDepot.com>

[CAUTION: EXTERNAL SENDER]

----- Forwarded Message -----
From: Tumani Nyajeka <tmnyajeka@yahoo.com>
To: "neff@ats.edu" <neff@ats.edu>
Sent: Wednesday, December 20, 2017, 12:33:27 PM EST
Subject: (CONFIDENTIAL) SEXUAL ASSAULT AND HARASSMENT, GAMMON/ITC:

SEXUAL ASSAULT AND HARASSMENT, GAMMON/ITC:
(ATS. COMPLAINT FOR THE RECORD).

A TIMELINE. (UnEdited).

I. Sexual Assault and Harassment by Dr. Mafico. A Brief Summary.

1. In October of 1998, Dr. Temba Mafico, sexually assaulted me after a meeting in his office.

   1. After the shocking incident I would silently endure many forms of aggressive behavior and sexual advances from Dr. Mafico.       *perturbed*
   2. Managing to repel his persistent aggression triggered resentment which left him unashamed to openly express angry and hostile in all matters of our professional interaction.
   3. In 2001, I mustered the courage and openly shared the 'shameful secret ' of being a victim of this escalating violence with Dr. Wimberly, as Dean; Dr. Haney as Area Chair; and Dr. Grant, as a colleague.
   4. Instead of addressing and protecting me from further violence I would be Dr. Wimberley, appointed Dr. Mafico to a powerful position of Associate Academic Dean, Gammon/ITC.
   5. In this position of power, Dr. Mafico, would openly terrorize me as I watched him resort to multiple tactics to either interfere or block all my efforts at accessing opportunities for professional growth. All complaints to Dean Wimberley, were ignored.
   6. In 2009, I would once again asked Dr. Wimberley, to address and stop Dr. Mafico 's network continued interference with my work, he instead advised me to turn the other cheek and 'be nice' to him.

II. Dr. Mafico and Non-Renewal of my Contract.

   1. In March 2011, in his capacity as the newly appointed Interim Academic Dean Dr. Mafico, gate crashed a meeting I had arranged to confidentially meet with Dr. Peters, the new President of ITC. regarding a 'three-sentenced non-renewal of contract' letter that had been personally written in January by Dr. E. P. Wimberley, as Dean of Gammon/ITC.

In this meeting Dr. Mafico, openly verbally assaulted and humiliated me by claiming he had 'brought me' to Gammon/ITC. This lie symbolized my condition of helplessness at the power Dr. Mafico, wielded using it to sexually terrorize and abuse me each time Gammon/ITC adminstration promoted him.

   1. In this poweful position of Interim EVP, GammonITC, Dr. Mafico, was allowed by administration to deny all my requests for an internal Grievance Process to review the non-renewal of contract which had been unilaterally written by Dr. E. Wimberley. Denial of an internal grievance process by the Acting Dean, would result in loss of employment within a three- month period.

2. In July, 2011, Dr. Mafico, continued to exhibit his behavior of sexual harassment and intimidation through stalking me. For example, whilst teaching an evening Summer class Dr Mafico, without warning suddenly appeared, stood in the door-way for a while and walked away without saying a word. Since they had no idea of a certain side of his behavior towards me students in this class were left quite disturbed by the incident.(Dr. Battle, or Student witnesses to the incident available to verify stalking behavior directed at me).

3. Inspite of many requests and complaints seeking protection from Dr. Mafico's workplace sexual violence for 14 years, Gammon/ITC adminstration failed to hold him accountable creating a work environment that would guarantee safety and security.

4. In March 2011, Gammon/ITC appointed Dr. Mafico, to Acting Academic Dean, a Supervisory position he used to retaliate against my success at repelling all relentless forms of his sexual assaults and harassment from him.

5. Gammon/ITC,s failure to address extreme forms of sexual assaults and harassment from Dr. Mafico, as well as xenophobic violence from his 'friends ', Drs. M. Haney and S. Rasor interfered with and ended my work  I worked in a toxic and hostile workplace in which it became very difficult to leave for 14 years at ITC.

III. EEOC.

Please Note: A 2012/13 Investigation by the EEOC, concluded that Gammon/ITC was liable for many forms of harassment and discrimination which included sexual assault and harassment by Dr. T. Mafico. (Please see EEOC. doc. attachment).

Sent from my iPad

## Fw: ATS

Tumani Nyajeka <tmnyajeka@yahoo.com>

⸻ ⸻ 4/7/020 2:11 PM

**To:** Ods00312Cpc <Ods00312Cpc@OfficeDepot.com>

[CAUTION: EXTERNAL SENDER]


----- Forwarded Message -----
**From:** Tumani Nyajeka <tmnyajeka@yahoo.com>
**To:** "jaymen.chavda@chugh.com" <jaymen.chavda@chugh.com>
**Sent:** Thursday, March 9, 2017, 02:25:27 PM EST
**Subject:** Fw: Re: ATS


--- On Fri, 4/1/16, Nicholas Salazar <nicholas.salazar@chugh.com> wrote:

> From: Nicholas Salazar <nicholas.salazar@chugh.com>
> Subject: Re: ATS
> To: "Tumani Nyajeka" <tmnyajeka@yahoo.com>
> Date: Friday, April 1, 2016, 9:26 AM
> Good morning Dr. Nyajeka.
>
> I hope that all is well and that you are in great spirits!
>
> I am pulling that letter right now. I will mail you back the
> original and keep a copy. I will also scan it and
> email it to Ms. LaRue. I will copy you on that email.
>
> Nicholas Salazar, J.D., MBA | Attorney at Law
> Chugh, LLP
> 8800 Roswell Road, Building C, Suite 230 | Atlanta, Georgia
> 30350
> Direct: 770.881.9208 | Main: 770.270.1860 | Facsimile:
> 678.412.4669
> Los Angeles | Santa Clara | Edison | Atlanta | Washington,
> D.C.
> Bangalore | Chennai | New Delhi | Mumbai | Chandigarh |
> Ahmedabad
> www.chugh.com
>
>
>
> _____
> From: Tumani Nyajeka <tmnyajeka@yahoo.com>
> Sent: Thursday, March 31, 2016 11:53 AM
> To: Nicholas Salazar
> Subject: ATS
>
> Nick.
>
> Good morning. Could you please ask your Admn. Asst. to
> forward the Peters' letter on non-renewal of contract so I
> can forward to Rev. Neff at ATS. You should also feel free
> to forward it directly to her at : neff.larue@ats.edu.
> They have not asked for the document but it will be easier
> for them to have it on file.
>
> Stay Well.

**Tumani Nyajeka** <tmnyajeka@yahoo.com>
    men.chavda@chugh.com
    at 7:21 PM

--- On Wed, 2/1/17, Tumani Nyajeka <tmnyajeka@yahoo.com> wrote:

> From: Tumani Nyajeka <tmnyajeka@yahoo.com>
> Subject: Letter and Transcripts
> To: lewing@lakejunaluska.com
> Date: Wednesday, February 1, 2017, 3:36 PM
> Dr. Ewing,
>
>
> Happy New Year! Please read the letter attached briefly
> telling you the story of my experiences teaching on faculty
> at Gammon/ITC. I have wanted you to have this story for your
> records but was unable to do so since your abrupt departure
> from the Foundation of Evangelism was soon after the letter
> to Gammon in 2010.
>
>
> I continue to wish you the best and will continue to pray
> for your success as Executive Director and CEO of Lake
> Junaluska.
>
>
>
> Sincerely, In Christ,
>
> Tumani Mutasa Nyajeka. (Ph.D).



Thank you Tumani for sending this information to me. I am so sorry that your departure from Gammon was so painful. While humans will sometimes fail us we can rest in the assurance of God's constant love and grace.

**Jack Ewing**
Executive Director

91 N. Lakeshore Drive | PO Box 67 | Lake Junaluska, NC 28745
828.454.6702 | Fax: 828.452.2225
www.lakejunaluska.com

Follow Lake Junaluska on Twitter
Connect with Lake Junaluska on Facebook

Hide original message
On Wed, Feb 1, 2017 at 3:36 PM, Tumani Nyajeka <tmnyajeka@yahoo.com> wrote:
Dr. Ewing,

Happy New Year! Please read the letter attached briefly telling you the story of my experiences teaching on faculty at Gammon/ITC. I have wanted you to have this story for your records but was unable to do so since your abrupt departure from the Foundation of Evangelism was soon after the letter to Gammon in 2010

I continue to wish you the best and will continue to pray for your success as Executive Director and CEO of Lake Junaluska.

Sincerely, In Christ,

Tumani Mutasa Nyajeka. (Ph.D).

*I wrote Send*

*1. Ewing, Mr. (Chanda has copy) letter to Dr. Ewing, the then Director of Foundation of evangelism; fleet details of case*

*ENail: Feb 17, 2017*

*(Basic Narrative/Breakdown by Mr. Selazar 2 (hugh firm))*

Executive Director and CEO

Lake Junaluska.

Jack,

I am writing to let you know it was a real joy to re-link with you in your 'new' position as Director of Lake Junaluska, during the Western North Carolina Annual Conference. I have wanted for a long time to applaud you for the courage you took when you seized the opportunity and quickly changed jobs choosing to work in a non-violent context away from the nefarious activities of the Foundation for Evangelism. In my case the Foundation did become the 'Trojan Horse' by which a network of cruel colleagues finally accomplished a goal they had set fifteen years earlier: to deny me as a woman, immigrant, African, highly qualified and competent member of faculty employment at Gammon/ITC.



Whoever depicted Dr. E. P .Wimberly's character as 'Brutal and ruthless' to you accurately captured the way he exercises power in positions of leadership. In my case he was not alone. From the day I took up a position to teach at ITC (from holding a Lilly Foundation Visiting Chair, at Berea College, in Kentucky) I encountered open hostility and resentment from three faculty colleagues; an African American female (xenophobe); a Caucasian male (racist); and a Zimbabwean male (misogynist, sexually harassed). The first too declared I was 'too qualified' to join Gammon/ITC faculty and should leave to teach elsewhere, and the Zimbabwean male, subjected me to sexually harassment which turned into gender violence after rejecting his advances for the fourteen years I was on Gammon/ITC faculty.

In my first semester of teaching the two colleagues in my Area quickly acted on this hostility and resentment by launching a ten-year, 'Inquisition style' of bullying tactics tampering with the school's processing of immigration documents seeking to render me as ineligible for employment at Gammon/ITC. These first ten years of teaching unfolded into nightmare as the school 'held' these documents finding myself working under conditions of 'virtual servitude', being harassed and bullied; benefits and an equitable salary denied or withheld; faculty development opportunities ( interviewing processes for promotion of faculty development would always degenerate/ turn into 'witch-hunt' torturous experiences as one or two of these bully colleagues 'found their way' into every interviewing committee in which my name appeared for consideration or professional growth); I was denied the right to engage my own attorney to rescue me from the immigration document processing (meaning I was not free leave Gammon/ITC); False Faculty Evaluation material was manufactured and secretly planted in my file to justify non-renewal of contract; aggressive sexual harassment which was allowed to turn into an extreme form of gender based violence was ignored every time I asked the Dean to address the matter (dean Wimberley, actually advised me to 'try hard and be nice' to the Zimbabwean males who were assaulting me'(all whom he personally knew); government documents authorizing my employment at ITC vanished suddenly whilst in custody of Dean Wimberley as I was in the middle of interviewing for the Chair of Evangelism ( the African American female, and Zimbabwean male, bully alliance found their way into membership of the Chair of Evangelism Search Committee, and the two spearheaded an interviewing process that would turn into a four-year nightmare of a bullying campaign

against my selection in which they manufactured stories, reviews and hurled insults seeking to justify blocking my candidacy for the Chair. Some of these were: I was 'over-qualified; position not for a Duke or Northwestern University graduate; too competent in current teaching position and should remain there; Methodist entitlement syndrome etc'. ('leaked' in corridor by Dr Mafico, as he gloated decision to deny my candidacy and continue Search for Chair of Evangelism, by their Committee.)

Through the leadership of Dr. M. Battle, then President of ITC being selected and appointed into the Dorothye and Cornelius Henderson, E. Stanley Jones Chair of Evangelism was not only an honor but also a sigh of relief as I anticipated a new beginning with additional moral and resource support from a Foundation guided by the United Methodist Church global human rights principles. This opportunity was another Good News as it had taken so many angels like the late Dr. Thomas Langford, at Duke University to support a passion and commitment to Christian ministry as an immigrant, woman, clergy of Southern African origin. That is why I was so happy to welcome you the day you came for a class visit (after a strange request by telephone for such) with Dr. Gunter; At my invitation we team taught the **_Intro. to Evangelism_**, class and you openly and clearly stated the reason for your class visit as to 'pledge support' for my work in the Chair at Gammon/ITC. spoke to a class of 35 Master of Divinity/Graduate students. You should also know that all along I had for something assumed that having been a member of faculty at Candler, Emory University for a long time Dr. Gunter, as coordinator of Chairs of Evangelism, knew or was personal colleague to one or two of the three bully faculty colleagues whose resentment and hostility at my appointment to the Chair remained vicious with targeted violence open and escalating (Dr. Battle, as President. A Witness/Protected me from this violence for 4 years). The reason for your class visit with Dr. Gunter, as you given to students and lecturer was false but also in extreme violation of the Gammon/ITC Faculty Handbook; The Principles and Standards the ATS and SACS. Dr Gunter (x2); and yourself (x2) as 'officials' of The Foundation for Evangelism within a four year period had conducted 3 'official sites visits' to Gammon/ITC. Neither I nor the President of ITC (Dr Battle) was informed of these 'plans to visit, and each time no purpose, report or review for/on visit was given not documented. (Sep/Oct)  (Dec)

Soon after your class visit you wrote a letter to Gammon, primarily highlighting what was given as a) Dr. Wimberley's incompetence as Dean, in communicating with the Foundation (2 pages); b) recommending I teach in position of Chair another academic year only because even though an outstanding scholar and teacher, I was not communicating well with the Foundation (1 sentence).(False as I had been to the Annual Meeting in Chicago, 3months earlier with everyone, as I had diligently made the effort to do with very little resources for 4 years).Again, this letter from the Foundation was in violation of every Principle and Standard that protect the rights of faculty members teaching in US Colleges and Universities.
Foundation gave me the copy )

You should not be surprised to know that Dr. Wimberly decided to conceal his copy of the letter and, with the 'secret' help of Dr Haney, proceeded to immediately write a three-sentenced letter to me in which he stated that the school would not renew my contract in June, because a) funding from the Foundation had ended (false) and b) he had received a written complaint regarding my performance from the Area. Both explanations were false. In February Dr McCrary, as Area Chair found out that over the Christmas holiday the Dean had secretly worked with Dr. Haney, (who by then had taken her work-place bullying skills to another level as she manufactured a bogus faculty Evaluation document; pilfered

an Official envelope from the Office of the President of ITC (new President) and submitted it to Wimberley, but dated 3 days than the three -sentence non-renewal of contract letter by Dean to me ). The letter you wrote to Gammon from the 'Foundation' became the instrument used to orchestrate a professional and personal nightmare as I lost my employment within a three-month period after many years of workplace, bullying, discrimination, and sexual harassment. In doing so these bully colleagues literally threw me and a ten-year old child into the streets, in the United States.

I would urge you to find time and be available to your brilliant daughter as she tries to navigate, seek support, and inclusion from colleagues and the institution she has chosen for teaching and affiliation. It is wrong for institutions to continue maintaining punitive misogynistic cultural practices that deny gifted women access and support as well as the ability to fully exercise their capacity to teach, lead or engage communities of their belonging. I have been praying for her.

Do not hesitate to verify any statement or claim made in this brief letter. (Some contact persons: - xenophobia, racism and misogyny: Dr. Rosetta Ross, Spelman College, Dr. Jackie Grant Gammon/ITC, Dr. M. Battle, President ITC- Scholarship and work in Chair of Evangelism- Dr. Walter McHelvey, President Gammon, Dr. Michael Franklin; Dr. Larceye Warner, Duke, Divinity School, Dr. J.Z. Kurewa, Africa University; Research as Scholar or student- Dr. Ted Campbell, Southern Methodist University; Professor M. Masenya, The University of South Africa (UNISA); Dr. Ken Yamada, GBHM ; A commitment to ministry and the church and its mission- Bishop E. Nhiwatiwa, Zimbabwe, Bishop J. Nhanhaia, Mozambique). Many students available to speak to anyone regarding any aspect of my being part of this academic community-Gammon/ITC.

I pray that Christ continues to give you the courage and wisdom to shun these networks /circles of tireless 'wolves in sheep's clothing', who hunger and thirst for nothing but to inflict pain on the innocent and God's creation. (Matt. 5.5).

Sincerely in Christ,

TumaniMutasaNyajeka. Ph.D.

# Bishop Alfred L. Norris, Sr.
# Bishop-in-Residence at Gammon



Bishop Alfred Norris, Sr. has been elected to serve as Bishop-in-Residence at Gammon Theological Seminary. Bishop Norris retired from the episcopacy in July 2004. He served as the resident bishop of Houston area upon his retirement.

Bishop Norris is from New Orleans, Louisiana where he served as a Pastor, and District Superintendent. Bishop Norris is married to Dr. Mackie Norris and they have a son and daughter and four grandchildren.

Bishop Norris will primarily work in the areas of Recruitment and Fundraising for the seminary. Bishop Norris is formerly one of the past president's of Gammon before being elected to the episcopacy.

We welcome Bishop Norris's return to Gammon in this capacity and look forward to the creative and strategic efforts he will bring to this office.

# Dr. Tumani Nyajeka
# Appointed to The Dorothye and Bishop Cornelius Henderson Chair and E. Stanley Jones Professor of Evangelism at Gammon/ITC



Dr. Tumani Nyajeka, Assistant Professor of Missiology and Religions of the World at The Interdenominational Theological Center has been selected by The Board of Trustees of the Foundation for Evangelism of The United Methodist Church. She will hold this position for three academic years beginning July 1, 2005.

Dr. Nyajeka is ordained in the Zimbabwe Annual Conference of The United Methodist Church and has worked with the women's movement in that country, which is an evangelistic model, stated Dr. Edward Wimberly, Vice-President of Academic Services at ITC. She has worked with the Wesleyan cell group, which is significant for the students at ITC and for church growth in the United States.

Nyajeka has been teaching exclusively in the field of evangelism and related subjects, i.e., Wesley studies, new congregational development in the program of Evangelism. She will participate in the Academy for Evangelism in Theological Education with other E. Stanley Jones Professors of Evangelism in October 6-8, 2005 in Washington, D.C.

The Foundation for Evangelism makes grants to the United Methodist seminaries to support Christian evangelism by establishing and continuing E. Stanley Jones Professorships in Evangelism. The Chair is named for Gammon's former President, Bishop Cornelius L. Henderson and his wife Dorothye.

*Bishop Cornelius L. Henderson and his wife Dorothye.*

# SAVE THIS DATE!
**SEJ Black Methodists for Church Renewal, Inc.**

**Annual Meeting**
**October 27-29, 2005**
**Jackson, Mississippi**
**Rev. Albert Shuler, D.S.**
**Jurisdictional Coordinator**

# NEW HORIZON

**GAMMON THEOLOGICAL SEMINARY**
653 Beckwith St., SW
Atlanta, Georgia 30314

**Bishop Melvin Talbert**
Chairman of the Board

**Dr. Walter H. McKelvey**
President-Dean

Mrs. Madelyn C. Greene
Editor
404/581-0310
mcgreene@itc.edu

# Rev. Dr. Alonzo Campbell
# Outgoing National Alumni President

Rev. Dr. Alonzo Campbell of Denham Springs, Louisiana has given outstanding leadership over the past years as National Alumni President and Vice-President of the National Gammon Alumni Association.

He has left a lasting legacy of support in the areas of recruitment of prospective students for the seminary and an unparalleled and tireless worker as a fundraiser for Gammon. His participation and leadership in the Louisiana Conference; as a Board of Trustee; and churchman will be forever appreciated by all the people he has touched.

Rev. Dr. Campbell is truly one of the prophets that Gammon has trained. Dr. Campbell is married to Jacquelyn and they have one son. He is currently serving as the pastor at Roberts St Luke



# NEW HORIZON

## Gammon Theological Seminary

**Volume XX** | **SUMMER** | **August 2005**

# Dr. Walter Henry McKelvey

"**P**raise God from Whom all blessings flow!" Gammon is celebrating. We continue to be blessed. Much has happened, is happening and planned. As President-Dean for eight and a half years, I have experienced and witnessed an abundance of success. We have had our share of ups and downs but more ups than downs. As a result the institution continues to be vibrant and alive.

Our mission of recruiting, supporting, and educating pastors and leaders for The United Methodist Church is alive and well. Over these past eight years, we have graduated nearly two hundred new leaders. The goal is to continue to impact ministry in the United Methodist Church, the church universal and the world at large. While our numbers are somewhat smaller than the other UM related theological schools, the quality of leadership displayed by our grads matches any and all others.

The primary needs of Gammon run parallel to many institutions of higher learning. The needs are couched in the areas of recruitment and adequate fiscal maintenance. However, we are grateful for our alumni, connectional and consortia support. The mission of Gammon continues to be alive and well because of its relationship to the United Methodist Church, its membership in the consortia of the Interdenominational Theological Center and the support given to the institution by alumni and friends.

The physical challenges continue. Property maintenance and upkeep are phenomenal. Several years ago we renovated our Willis J. King Apartment Complex. Even now, there remain maintenance challenges with this building. Currently we are renovating the Gammon Building at a cost exceeding two and a half million dollars. We celebrate this feat and plan rededication at our Founders' Day Festivities October 10-12, 2005.

The desire is to move enrollment to a higher level and have buildings and facilities meet desired codes and living standards.

Alumni and friends are invited to save the October 10-12 dates. This year we celebrate the 122nd year of our founding. Thematically, we will revolve around various issues related to religion and politics. Please



watch for the formal notices and invitations that will come to you through the mail and on the *gammonseminary.org* web-site.

Continue to be in prayer for Gammon as we forge ahead.

*"Light, Freedom, Truth, be ever these our*
*own:*
*Light to seek the Truth,*
*Freedom to make it known;*
*Our work, God's work,*
*our will, God's will alone."*

# GAMMON THEOLOGICAL SEMINARY 122nd FOUNDERS' DAY AND THIRKIELD-JONES LECTURE SERIES
## OCTOBER 10-12, 2005
### *"Religion and Politics in the 21st Century"*

**Monday, December 10, 2005**

**Board of Trustee Meeting**
9:00 am - 4:00 pm

**Re-Dedication Service**
**Gammon Hall-Everett Chapel**
7:00 pm

**Tuesday, October 11, 2005**

**Founders' Day Worship Service**
**ITC Chapel**
11:00 am

**Alumni Luncheon**
**Paschal's Restaurant**
**Northside Drive**
12:30 PM

**Banquet**
**Airport Marriott Hotel**
**College Park, Georgia**
7:00 pm

**Wednesday, October 12, 2005**

**II Thirkield-Jones Lecture**
**Gammon Hall-Everett Chapel**

Members of the Search Committee on Evangelism 2063

Dr. Temba Mafico, Area I      (770) 323-1552

Dr. Mark Ellingsen, Area II    (770) 732-1329

Dr. Marsha Snulligan Haney, Area III    (404) 286-6677

Dr. Maisha Handy, Area IV    (404) 766-3959

Dr. Walter McKelvey, President/Dean- Gammon Theological Seminary
(404) 581-0300

*The* Foundation *for* Evangelism

# LEADERSHIP DEVELOPMENT

## E. STANLEY JONES PROFESSORS



*Dr. Stephen Gunter*
*Duke Divinity School*
*Durham, NC*

*Rev. Achim Hartner, M.A.*
*Theologische Hochschule*
*Reutlingen, Germany*

*Rev. Mark Teasdale*
*Garrett-Evangelical Theological Seminary*
*Evanston, IL*

*Dr. Scott Thomas Kisker*
*Wesley Theological Seminary*
*Washington, DC*

*Dr. John Wesley Kurewa*
*Africa University*
*Mutare, Zimbabwe*

*Dr. Arthur G. McPhee*
*Asbury Theological Seminary*
*Wilmore, KY*

*Dr. Sergei Nikolaev*
*Russia United Methodist Seminary*
*Moscow, Russia*

*Dr. Tumani Nyajeka*
*Gammon Theological Seminary*
*Atlanta, GA*

*Dr. Joon-Sik Park*
*Methodist Theological School in Ohio*
*Delaware, OH*

*Dr. F. Douglas Powe, Jr.*
*Saint Paul School of Theology*
*Kansas City, MO*

*Dr. Bryan Stone*
*Boston University School of Theology*
*Boston, MA*

*Dr. Leonard Sweet*
*Drew Theological Seminary*
*Madison, NJ*

*Dr. Robert G. Tuttle, Jr.*
*Asbury Theological Seminary*
*Orlando Campus, FL*

*Dr. Laceye Warner*
*Duke Divinity School*
*Durham, NC*

Through an endowment, The Foundation for Evangelism provides funding to support the E. Stanley Jones Professors of Evangelism whose purpose is to train pastors in the importance and the skills of helping persons experience God's transforming love through Jesus Christ. The Foundation supports 13 professorships at United Methodist-related seminaries and schools of theology around the globe. These professorships include 10 positions in the United States, one in Germany (Reutlingen), one in Russia (Moscow) and one in Zimbabwe (Mutare).

The primary focus of these professorships is classroom teaching for students in preparation for ministry in local churches. Most of this teaching occurs in Master of Divinity degree programs with an emphasis on forming ministers to enable growing congregations. In addition, several institutions provide education at the doctoral level, with our E. Stanley Jones Professors of Evangelism providing leadership. The presence of these thirteen professors results in an impact on the lives of millions of persons.



**INTERDENOMINATIONAL THEOLOGICAL CENTER**
700 Martin Luther King Jr. Drive, SW • Atlanta, Georgia 30314-4143
Phone: 404-527-7702 • Fax: 404-527-7770

**Office of the President**

July 1, 2010

Dr. Tumani Nyajeka
5846 Cobalt Drive
Powder Springs, GA 30127

Dear Dr. Nyajeka:

I am pleased to notify you that the Board of Trustees has sponsored your employment to the Dorothye and Cornelius Henderson Chair and E. Stanley Jones Associate Professor of Evangelism, Missiology and Religions of the World for the 2010-2011 academic year. The Board voted a modest increase in salary which is included. This is a tenure track position. You will be compensated your base salary in twelve equal parts in the aggregate amount of $50,318.49. You will also receive $3,793.30, which is ITC's voluntary participation in your self-employment tax. Thus, your total compensation for the 2010-2011 academic year will be $54,111.79.

Fringe benefits at ITC include payments of up to 4% of your salary for pension in an ITC sponsored plan with the employee contributing up to 4%, 50% of the cost for ITC's sponsored major medical and dental coverage, group life insurance, and group short-term disability. These payments are made by ITC in addition to the other financial terms of this letter.

The terms of your position are governed by the policies and procedures set forth in the *Faculty Handbook*. All faculty members are expected to adhere to section 2.8 of the *Faculty Handbook* entitled "Faculty Duties and Responsibilities." Though not listed in the *Faculty Handbook*, all faculty members are expected to attend the pre-school and post-school faculty council retreats. Grades must be submitted to the Registrar's office, as scheduled, during the academic year; if grades are not submitted as scheduled, payroll checks will be withheld. If you have any questions or concerns regarding this letter of employment, you should contact the vice president for academic services/provost Dr. Edward P. Wimberly.

If you have questions regarding Fringe benefits, you may contact the office of Human Resources. If not, please indicate your willingness to accept the terms of employment by affixing your signature below and returning three copies of this letter to the Office of Human Services on or before July 10, 2010.

Sincerely,

Thomas W. Cole, Jr...
President

Tumani Nyajeka                                          Date

C:

Dr. Edward P. Wimberly
Mrs. E. Littlejohn
Human Resources

CONSTITUENT SEMINARIES
Morehouse School of Religion • Gammon Theological Seminary • Turner Theological Seminary
Phillips School of Theology • Johnson C. Smith Seminary • Charles H. Mason Seminary • Lutheran Theological Center
MEMBER
Association of Theological Schools in the United States and Canada • United Negro College Fund
Commission on Colleges of the Southern Association of Colleges and Schools



**INTERDENOMINATIONAL THEOLOGICAL CENTER**
700 Martin Luther King Jr., Drive, SW • Atlanta, Georgia 30314-4143
404-527-7702 • FAX: 404-527-7770

**Office of the President**

June 13, 2006

Dr. Tumani Nyajeka
5846 Cobalt Drive
Powder Springs, GA 30127

Dear Dr. Nyajeka:

I am pleased to notify you that the Board of Trustees has sponsored your employment to the Dorothye and Cornelius Henderson Chair and E. Stanley Jones Associate Professor of Evangelism, Missiology and Religions of the World for the 2006-2007 academic year. This is a tenure track position. Your base salary will be $47,430.00. You will also receive $3,592.82, which is ITC's voluntary participation in your self-employment tax. Thus, your total compensation for the 2006-2007 academic year will be $51,022.82.

Fringe Benefits at ITC include payments of 8% of your salary for pension in an ITC sponsored plan, 70% of the cost for ITC's sponsored major medical and dental coverage, group life insurance, and group short-term disability. These payments are made by ITC in addition to the other financial terms of this letter.

The terms of your position are governed by the policies and procedures set forth in the *Faculty Handbook*. All faculty members are expected to adhere to section 2.8 of the *Faculty Handbook, April 1998* entitled "Faculty Duties and Responsibilities." Though not listed in the *Faculty Handbook*, all faculty members are expected to attend the pre-school and post-school faculty council retreats. Grades must be submitted to the Registrar's office, as scheduled, during the academic year; if grades are not submitted as scheduled, payroll checks will be withheld. If you have any questions or concerns regarding this letter of employment, you should contact the vice president for academic services/provost Dr. Edward P. Wimberly.

If you have questions regarding fringe benefits, you may contact the office of Human Resources. If not, please indicate your willingness to accept the terms of employment by affixing your signature below and returning four copies of this letter to the Office of Human Services on or before June 26, 2006.

With Best Regards,

Dr. Michael A. Battle
President

_____              _7/4/06_
Tumani Nyajeka                          Date

C:    Dr. Michael A. Battle
      Dr. Edward P. Wimberly
      Mrs. E. Littlejohn
      Ms. Janette Y. King

CONSTITUENT SEMINARIES
Gammon Theological Seminary • Charles H. Mason Seminary • Morehouse School of Religion • Phillips School of Theology
Johnson C. Smith Seminary • Turner Theological Seminary • Lutheran Theological Center
MEMBER
Association of Theological Schools in the United States and Canada • Atlanta University Center • United Negro College Fund
Commission on Colleges of the Southern Association of Colleges and Schools

*Please note: Attorneys Have copies of all/MOST of these files/Doc/AS well as School On/File.*

**Tumani Nyajeka** <tmnyajeka@yahoo.com>
c:joehopkins@pacbell.net
Dec 13, 2013 at 4:31 PM
Mr. Hopkins,

Good Morning. I hope you found the following documents as faxed:
1. EEOC Charge of Discrimination. I called Mr. Aniukwe's office for us to secure the
'right to sue' document as they should have it.

2. A July 22, 2011 Letter to the ITC President, Dr. Peters, asking him to honor the one
year left of the second term three-year contract in my position of E. Stanley Jones Chair
of Evangelism. And also asking to continue teaching in my position of Associate
Professor of World Religions as I had held for 14 years at ITC.

Please note, the typos in the first paragraph of this letter just show that by July of 2011,
a traumatized and overwhelmed mind by July, 2011.

3. Dr. Peters' April 21, 2011, non-renewal of contract letter in agreement with Dean
Wimberly's unilateral January letter. My position as Chair is mentioned in passing. In my
sixteen years of teaching I have never been evaluated as under-performing/poorly
performing by peers or students. Dr. Peters and Dean Wimberly, made the decision to
disregard not only my peer and student evaluation file, which was of the highest level,
but they also chose to by-pass the ITC Faculty Handbook process of addressing faculty
concerns.

Please note that Professor H. Welchel, Chair of the committee on Faculty Status Tenure
and Welfare, is not copied. And Dr. Carolyn McCrary, Chair, Area III, was by-passed at
every point of this swift process. She was not invited to the March, 28, meeting
mentioned in the letter.(just another kangaroo court)

4. Dean Wimberly's January 14, 2011, non-renewal of contract letter which he send by
FedEx to my home.
The first concern: Dr. Carolyn McCrary Chair of Area III, never sent a document
complaining about my work. My 'friend', Dr. Haney sent this letter in which she had
personally manufactured a list of 'concerns' with my work, out of the blue.

Dr. Haney's letter is dated January, 17th; three days after Dean Wimberly had already
expedited a non-renewal of contract letter.

Dr. Haney's letter shows as Ccd to Dr. McCrary who vehemently denies ever having
received a copy or been consulted on this matter. Dr. McCrary is the person who
confronted Dean Wimberly, and demanded to see the Foundation of Evangelism letter,
which he had refused to to give me a copy.

The letter from the Foundation did not state that my contract in the Chair should end in
June 30, 2011 as decided by Haney and Dean Wimberly.

**Charles-DeAndre' Wright**

From:      "Rebecca Todd Peters" <rpeters@elon.edu>
To:        <tnyajeka@itc.edu>
Sent:      Monday, May 17, 2004 9:27 AM
Attach:    shona.doc
Subject:   Greetings

Dear Dr. Nyajeka,

I am Toddie Peters and I teach ethics at Elon Univeristy in North Carolina.

I would first like thank you for your article "Shona Women and the Mutupo
Principle". I use it every semester in my Introduction to Religious Studies
course as an illustration for students to see a religious cosmology at work
and to help them understand how theological beliefs impact a community's
ethics.

I am also writing you with a question about the same article. I have used
it as an illustration in my current book, but I wrote it as if the use of
the Mutupo principle is still current practice among the Shona. As I taught
your article again this semester I realized that you were describing the
Shona and their culture from 100 years ago. Because this illustration is so
important to the point I am trying to make, I was hoping you might read over
the three pages I have attached and let me know if the way I am discussing
the Shona and the Mutupo principle is accurate.

The book project itself is aimed at offering a typology of globalization
(neoliberal, development, earthist, and post-colonial) that helps readers
understand the complexities and differences present in different views and
experiences of globalization. The section I have attached describes the
value of "community" as the context for moral agency within the postcolonial
view of globalization. The book manuscript won the 2003 Trinity Prize and
will be published by Continuum this fall.

I do hope that you will have the time to look over these few pages and
respond.

Many thanks in advance for your help and for your work.

Toddie Peters
--
Rebecca Todd Peters, Ph.D.
Distinguished Emerging Scholar
Assistant Professor of Religious Studies
Elon University
2260 Campus Box
100 Campus Drive
Elon, NC 27244
Email: rpeters@elon.edu
Phone  (336) 278-5315



*Paine College*

Office of the President

1235 Fifteenth Street
Augusta, Georgia 30901
Tel: 706.821.8230
Fax: 706.821.8333

August 15, 2006

The Rev. Dr. Tumani Mutasa Nyajeka
Cornelius and Dorothy Henderson Chair of Evangelism
Stanley Jones Associate Professor of Evangelism
Interdenominational Theological Center
700 Martin Luther King, Jr. Dr. Atlanta, Georgia
Atlanta, GA 30314

Dear Dr. Nyajeka:

Greetings. Congratulations on your outstanding presentation at the Women of Color
Scholars meeting. You are a marvelous example of spiritual leadership.

I look forward to inviting you to Paine College in the near future. You will be an
inspiration to my students, my faculty –and me.

Best wishes. I look forward to seeing you again soon.

Sincerely,

Shirley A. R. Lewis
President

SARL:jdh



A College of The United Methodist Church and the Christian Methodist Episcopal Church

## Elaine Jenkins

**From:** Elaine Jenkins
**Sent:** Wednesday, October 11, 2006 10:01 AM
**To:** 'tnyajeka@itc.edu'
**Subject:** Autographing your new book...

Greetings, Dr. Nyajeka. I hope that this brief post finds all well with you.

I hope that I am not being presumptuous---if I am, please forgive me and attribute it to my excitement about your book and the AU press publication of it---but I have placed in the mail to you two copies of your book for your autograph. One is for the AU development office; the other is for the donor whose gift made the AU press possible. We know that he will be well-pleased to see the fruit of his gift.

I have enclosed a return envelope for your convenience.

*Tinotenda-siyabonga kakulu!*

*Elaine Jenkins*
Director of Planned Giving
Africa University Development Office
P. O. Box 340007
Nashville, TN  37203-0007
Telephone: (615) 340-7428
Fax:          (615) 340-7290
Email:       ejenkins@gbhem.org

*This electronic message contains information from the Africa University Development Office which may be privileged or confidential. The information is intended to be for the use of the individual(s) or entity named above. If you are not the intended recipient be aware that any disclosure, copying, distribution or use of the contents of this information is prohibited. If you have received this electronic message in error, please notify us by telephone or e-mail (to the numbers or address above) immediately. Thank you.*

Student:
Email.

**ilungamwepu** <dikonzomwepu@gmail.com>
**To:tmnyajeka@yahoo.com**
May 16 at 1:38 PM

Greetings from your former student at AU in Zimbabwe, my name is Rev Master IlungaMwepuDikonzo Edmond
I did Pastoral Care and Counseling and my subject was: An Investigation Into The Practice of Premarital
Counseling Among United Methodist Congregations in the Galilee District, Southern Congo Annual Conference
Democratic Republic of Congo.
I was recommended by Bishop Mande Muyombo for Funded PhD Programme for African Methodist
Theological Educators, so in the application form they asked me to have an academic reference some one who
was my University Professor or my dissertation supervisor, reason why I have come to you and I have seen in
you sommebody with talent and able to countinue being my supervisor and my academic reference in this PhD
programme. The study will be A partnership between Africa University & Wesley House Cambridge.
Please Prof I hope in you as you know at AU there is nobody else who can do that on your behalf.
Waiting Forward,
I will also send you the subject and the outline once you confirm and I will need all your contacts as soon as
possible because the deadline is on 21st May 2018. I already finished everithing only your contact I was
missing, I got it today from Rev Bondo.
Soon.

# MAKING DISCIPLES IN A WORLD PARISH

Global Perspectives on Mission & Evangelism



PRINCETON
THEOLOGICAL
MONOGRAPH
SERIES

**PAUL W. CHILCOTE**

Article 2011.



# ENCYCLOPEDIA OF
# RELIGION
# AND
# NATURE

### VOLUME I:  A-J

### EDITED BY **BRON TAYLOR**



Case 1:20-cv-04434-TWT   Document 1-1   Filed 10/30/20   Page 51 of 64



*The* WESLEY
STUDY BIBLE

*Love God with a warmed heart. Serve God with active hands.*

* FAITHFUL SCHOLARSHIP
* LIFE APPLICATION
* DISCIPLESHIP PRACTICES

Article Contributed

Navneet S. Chugh*+
Sherwood Tung*+
Kirti Kalra*+
Melissa Chan*+
Navdeep Meamber*+
Diya A. Mathews*†◦
Vandana P. Marath◦∞
Lihua Tan*†
Brinda Gandhi+
Jaymen Chavda∆
Gladys Gervacio+
Yeon Me Kim~∞
Mohammad Khan+
Prema Roddam†

* Partners
  +Admitted in California
  ∆Admitted in Georgia
  ◦Practice limited to
   Immigration Law
  †Admitted in New York

Santosh Reddy Somi Reddy~^
Krishnakala Busani ¤
Jalpa Shah+
Earth Shah+
Shafiqa Kureshi+
Vijay Yellareddigari∩∞
Kritika Bharadwaj†
Amit Patel◦
Gurshaan Chattha+
Rubeena Sachdev+
Mishita Jethi†
Chetena Kaasam†
Sismi Raju Menachery†
Bhakti Shivarekar†‡
Nishita Patel+

~Admitted in Virginia
^Admitted in New Jersey
¤Admitted in Illinois
∞Admitted in Washington DC
□Admitted in Pennsylvania
◊Admitted in Connecticut



**CHUGH**

**Attorneys at Law**

**CHUGH, LLP**

CERRITOS • SANTA CLARA • EDISON • ATLANTA • RESTON
INDIA AFFILIATE OFFICES
BANGALORE • CHENNAI • NEW DELHI • MUMBAI • CHANDIGARH•
AHMEDABAD

February 27, 2017

- Lack of legal fees.
- Attorney N. Salazar no longer w Firm.
(was informed by phone.)

Dr. Tumani S. M. Nyajeka
616 Morehead Street
Eden, North Carolina 27288
tnyajeka@yahoo.com
VIA EMAIL AND USPS

RE: Legal fees

Dear Dr. Nyajeka,

Thank you for writing us about your concerns regarding legal fees pursuant to the Attorney-Client Fee Agreement signed in July of 2015 (the "Agreement"). In the Agreement, you agreed to pay our firm an initial retainer of Two Thousand Five Hundred Dollars ($2,500.00). Under the terms of the Agreement, "this retainer is non-refundable, and deemed earned when received." The intent of a retainer is to ensure payment for future service or work to be rendered.

Upon review, Nicholas Salazar, the attorney assigned to your case, expended over 50 hours investigating your case. At Mr. Salazar's hourly rate, these services amount to over $11,000 in legal fees. While the legal fees quickly exceeded the retainer of $2,500, Mr. Salazar continued to pursue your case, gathering facts and evidence, and providing regular updates. It was only at the conclusion of these hours that it was determined that we were unable to pursue your claims further.

As such, during our phone call which terminated our attorney-client relationship, I provided reference(s) local to your home in Eden. We would be happy to provide another reference if you wish. Thank you again for allowing Chugh, LLP to represent you. We wish you the best moving forward.

Sincerely,

Amit Patel

1

| | | |
|---|---|---|
| **LOS ANGELES**<br>15925 Carmenita Road<br>Cerritos, CA 90703<br>Tel: (562) 229-1220<br>**SANTA CLARA**<br>4800 Great America Parkway<br>Suite 310<br>Santa Clara, CA 95054<br>Telephone: (408) 970-0100<br>Facsimile : (408) 970-0200<br>**NEW JERSEY**<br>70 Wood Avenue South,<br>1st Floor<br>Iselin, NJ 08830-2714<br>Telephone: (732) 205-8600<br>Facsimile : (732) 205-8601<br>**VIRGINIA**<br>3900 Jermantown Road<br>Fairfax VA 22030<br>Fax:(703)877 0871<br>Telephone :(703)877 0870 | <br>**Attorneys at Law**<br><br>2310 PARKLAKE DRIVE, SUITE 525<br>ATLANTA, GEORGIA 30345<br>TELEPHONE: (770) 270-1860<br>FACSIMILE: (678) 412-4669<br>EMAIL: INFO@CHUGH.COM<br>WWW.CHUGH.COM | **BANGALORE**<br>#302 Regency Enclave<br>4 Magrath Road<br>Bangalore 560 025, India<br>**CHENNAI**<br>3/1 Sai Durbar<br>50 II Main Road, R A Puram<br>Chennai 600 018, India<br>**DELHI**<br>#A-004 Maurya Apartment<br>95 IP Extension,<br>Delhi 110 092<br>**MUMBAI**<br>312, Turf Estate, Shakti Mill<br>Lane, Off. Dr. E. Moses Road,<br>Mahalakshmi<br>Mumbai Maharashtra 400011<br>**CHANDIGARH**<br>S.C.O. 170-172, Sector 17-C<br>Chandigarh 160017<br>Main Line:+91 172 3042 032 |

## ATTORNEY-CLIENT FEE AGREEMENT

This **ATTORNEY-CLIENT FEE AGREEMENT ("Agreement")** is the written fee contract that Georgia law requires lawyers to have with their clients, and is entered into by and between **TUMANI NYAJEKA ("Client(s)"** ; **"you"**; or **"your"** ) and **CHUGH LLP, ("Attorneys"**, **"us"**; **"our"** or **"we"**).

**1.    CONDITIONS:** Provision of legal services and compensation thereof will be governed by this Agreement.  Services will include litigation—in court, administrative hearings, before government agencies, arbitration tribunals, or mediation. It will also include discussions and conferences with you and other parties.

This Agreement will not be effective, and we will have no obligation to provide legal services, until a signed copy of this Agreement and initial retainer deposit as stated in Paragraph 4 below are received.

This Agreement will take effect when you have performed the conditions of this Paragraph, but its effective date will be retroactive to the day Attorneys first provided legal services.  The above date is for reference only.  Even if this Agreement is not effective, you are obligated to pay us the reasonable value of any services we may have performed for you.

**2.    SCOPE AND DUTIES:**  You are hiring us as your attorneys to provide legal services in connection with general legal services in regards to the termination of your previous employment at Gammon Theological Seminary.  We will provide services reasonably required to represent you.  We shall take steps to keep you informed of the progress and respond to your inquiries.

Our services DO NOT include an appeal of this case, should we not be successful in litigation.  Furthermore, our services DO NOT include legal services or advice on any other matter other than the termination of your previous employment at Gammon Theological Seminary.

If any fresh unrelated matter comes up, and if mutually acceptable to both you and all other Attorneys, the terms of this Agreement may be applied to such new matter, otherwise a fresh agreement will be required.

3.      **CLIENT DUTIES:**  Be truthful with us, cooperate with us and keep us informed of developments that occur in your knowledge, abide by this Agreement, pay our invoices on time and keep us advised of your address, telephone number, and email address.

4.      **MINIMUM FEE/DEPOSIT/RETAINER:**  You agree to pay an initial deposit/retainer of $2,500.00 at signing of this Agreement which will be deposited in our Client Trust Fund. This retainer is non-refundable and deemed earned when received.    You authorize us to withdraw from this trust account to pay any emergency costs and expenses.

5.      **LEGAL PROFESSIONAL FEES:**  The total fee for our services includes the above-mentioned non-refundable Twenty Five Hundred Dollars ($2,500.00) in addition to one-third (1/3) of all damages obtained pre-trial. Should your case not be resolved pre-trial, and should litigation become necessary, our fee will consist of the above-mentioned non-refundable Twenty Five Hundred Dollars ($2,500.00) in addition to forty percent (40%) of the entire award of damages.

        All other fees, if any and if necessary, are billed hourly at a rate of Two Hundred Twenty Five Dollars ($225) per hour at quarter-hour units, i.e., minimum 15 minutes.   Our hourly professional staff rates are based on years of experience, training and practice, and level of professional attainment.   Although we may, for your convenience, furnish estimates of fees or charges that we anticipate may be incurred on a case, but these are subject to unforeseen circumstances and are inexact.  We will not be bound by any estimates except as otherwise expressly set forth in this Agreement.  To the extent possible, we attempt to use associate attorneys and paralegals to keep costs low to you.

6.      **COSTS AND EXPENSES:**
        (a) **Main Provision:** Costs and expenses shall be paid by you.
        (b) **In General:**  These costs and expenses are in addition to the fee agreed to above, and include, but are not limited to: process servers' fees, court filing fees, court reporters' fees, long distance telephone calls, messenger and other delivery fees, postage, parking and other travel expenses, photocopying/reproduction costs, computer research work, and other similar items. All costs and expenses will be charged at rates laid down from time to time.
        (c) **Out of Town Travel:**  Transportation, meals, lodging, and all other costs of any necessary out-of-town travel.
        (d) **Experts, Consultants and Investigators:**  To aid in the preparation or presentation of your case we will select expert witnesses, consultants, or investigators for hiring.  We will not hire unless you agree to pay their fees and charges in advance.

7.      **BILLING INVOICES:**  We will send you monthly fee, costs and expenses invoice. You agree to pay such invoices within fifteen (15) days of the date of the invoice.  You must review these invoices and advise us with any comments that you may have prior to the date of payment. A late charge of 1½% per month will be imposed on any billed amounts that remain unpaid for 30 days or more.

        In many cases we do not charge you for certain services though specifically performed for you.  Such entries in the invoices are annotated as "no charge" to indicate to you that the service was performed but not charged. Similarly, under some circumstances we provide "discount" to our regular customers.  You must note that all "no charges" and "discount" are only valid and applicable if the invoices are timely paid.  If invoices are not timely paid and we

2                                           ____ Client Initials

have to recover our fees through arbitration, mediation and/or through court, then all such "no charge" entries and discounts shall stand reversed and claimed through such proceedings. Should it be necessary to institute collection proceedings, you will be responsible for attorney's fees in the amount of 15% of the outstanding balance at the time proceedings are instituted.

## 8. DISCHARGE, WITHDRAWAL, TERMINATION OR CONCLUSION OF CASE:

You may discharge us at any time. We may also withdraw with your consent or for "good cause". "Good cause" includes your breach of this Agreement, your refusal to cooperate with us or to follow our advice on a material matter or any other fact or circumstance that would render our continuing representation unlawful or unethical. We reserve the right to terminate the Attorney-Client relationship, to the extent permitted by law, in the event that our invoice is not paid.

If on discharge/withdrawal you require a copy of the proceedings up to that date, you will be charged $0.35 per page and any other charges for the making and supplying the same.

When Attorneys' services conclude, all unpaid charges shall become immediately due and payable. Attorneys will, upon your specific request, deliver the file(s) to you along with your funds or property, if any, in Attorneys' possession. In case you do not request and collect the case files after the case has terminated, Attorneys shall destroy any such files after three (3) years from the date of conclusion or termination of the case.

9.   **LIEN**: You hereby grant us a continuing lien on any and all claims or causes of action that are the subject of our representation under this Agreement. Our lien will be for any sums owing to us at the conclusion of our legal services. The lien will attach to any recovery you may obtain, whether by arbitration award, judgment, settlement or otherwise, including if the same are obtained even after the services of the Attorneys have been terminated or Attorneys have withdrawn for "good cause" and the amounts are still outstanding to be paid to Attorneys.

10.   **COLLECTION OF AMOUNTS DUE TO CLIENT(S) FROM OPPOSING PARTY:**
All amounts collected, through settlement, award, judgment or otherwise, will be collected by us and deposited in CHUGH LLP Trust Account. We will pay you after deducting the Attorneys' fee and all outstanding costs and expenses under Paragraphs 5 and 6 above. Under this right of lien, you authorize Attorneys to retain/withdraw any outstanding fees, costs and expenses from any money received by us through above means.

11.   **DISCLAIMER OF GUARANTEE:** While we will strive and do our utmost to serve and represent your interests professionally, efficiently and effectively, but we cannot guarantee the success of any matter. Therefore, nothing in this Agreement or in our discussions with you will be construed as a promise or guarantee about the outcome of your matter, because Attorneys make no such promises or guarantees. Such comments, if any, are only expressions of opinion.

12.   **ENTIRE AGREEMENT AND BINDING EFFECT:** This Agreement contains the final and entire understanding and agreement of Client(s) and the Attorneys. There are no representations, statements, promises, terms, conditions, oral or written, other than those set forth in this Agreement or in any written amendment or modification of this Agreement in writing and signed by the parties. This Agreement shall be binding upon Client(s) and the Attorneys and their respective heirs, personal representatives, successors, and assigns. It shall be interpreted

3                                                     Client Initials

under the laws of the State of Georgia and shall be enforceable in the courts of Georgia having jurisdiction.

**13.    ARBITRATION OF FEE DISPUTES:** Attorneys and you agree that in case of any fee dispute, including any costs and expenses, the parties shall arbitrate the matter under the provisions of Georgia law.

**IN WITNESS WHEREOF**, Client(s) and the Attorneys have executed this Agreement as of the date given against their signatures below, and Client(s) hereby acknowledges receipt of a copy thereof.

**CHUGH LLP**

By: _____

Name: Nicholas Salazar, Esq. and Jaymen J. Chavda, Esq.
       **"Attorneys"**

AGREED AND ACCEPTED this _____ day of _____, 2015.

By: _____
       **Tumani Nyajeka**
       **"Client(s)"**
Address:    616 Mureitenh St.
            Eden. N.C. 27730.
Telephone:  336/740/5360.
E-mail:     tuminjajeka@yahoo.com.

**Nicholas Salazar**   nicholas.salazar@chugh.com
tmnyajeka@yahoo.com

Friday at 11:30am is perfect. I will put it down on my calendar. I am currently reviewing your latest documents right now. Thank you for sending those over!

Nicholas Salazar, MBA   Attorney at Law

**Chugh, LLP**

2310 Parklake Drive, Suite 525 , Atlanta, Georgia 30345
Direct: 770.881.9208   Main: 770.270.1860   Facsimile: 678.412.4669

Los Angeles   Santa Clara   Edison , Atlanta   Washington, D.C.

Bangalore   Chennai , New Delhi | Mumbai : Chandigarh   Ahmedabad

www.chugh.com

Nick,
G9dood morning. Forgot to give your office general # of docs in files.
File I     ..6 docs; File II..  6; File III. ......; File. IV. .....11doc; File V.....9 docs . Please ask Legal
Assistant to conduct cursory review and select what is helpful. .

Tumani

Sexual Assault/Harassment
P5-7F.



Navneet S. Chugh* ·
Sherwood Tung* +
Kirti Kalra* +
Melissa Chan* ‡
Navdeep Meamber* ⊢
Diya A. Mathews*†ᵒ
Vandana P. Marath⁷⁄⁴
Ishita Tan*‡
Brinda Gandhi ⊢
Minal Belani +
Sameera Sani~
Jaymen Chavda⌐.

Gladys Gervacio†
Ameet Mitharu⊢
Yeon Me Kun~×
Malou Mararang†ᵒ
Santosh Reddy Somi Reddy⌐⁷
Mohammad Khan ⊢
Roshen Prasad⊢
Sneha Pathak ⊢
Krishnakala Busam²⁴
Prema Reddam†
Jalpa Shah ⊢
Earth Shah+
Nicholas Salazar ⊢

**CHUGH**
**Attorneys at Law**

* Partners
‡ Admitted in California
Ω Admitted in Georgia
· Admitted in Maryland
ᵒPractice limited to
   Immigration Law
† Admitted in New York

**CHUGH, LLP**

CERRITOS • SANTA CLARA • EDISON • ATLANTA • FAIRFAX
INDIA AFFILIATE OFFICES
BANGALORE • CHENNAI • NEW DELHI • MUMBAI • CHANDIGARH•
AHMEDABAD

◊ Admitted in Connecticut
· Admitted in Virginia
⌐ Admitted in New Jersey
π Admitted in Illinois
⁄ Admitted in Washington DC.

Dr. Edward L. Wheeler
President
Interdenominational Theological Seminary
700 Martin Luther King Jr. Drive
Atlanta, GA 30314

RE: **SEXUAL ASSAULT, HARASSMENT, WORK PLACE INJURY, AND**
**WRONGFUL TERMINATION OF DR. TUMANI NYAJEKA'S EMPLOYMENT**
**WITH THE INTERDENOMINATIONAL THEOLOGICAL SEMINARY**

Dear Dr. Wheeler,

This office represents Dr. Tumani Mutasa Nyajeka with regards to her wrongful termination from
the Interdenominational Theological Center ("ITC") on June 30, 2011. The purpose of this letter is to
demand that ITC compensate Dr. Tumani Mutasa Nyajeka ("Dr. Nyajeka") for all remaining
compensation and unpaid benefits owed to her under her employment contract, and all other damages
suffered by Dr. Nyajeka which resulted from ITC's wrongful termination of her employment contract. In
support of the above, Dr. Nyajeka shows the following:

I. **STATEMENT OF FACTS**

Dr. Nyajeka is originally from the African nation of Zimbabwe and is a highly educated, qualified,
and distinguished professor having published numerous articles on African theological principles, as well
as having presented numerous speeches and presentations on matters of theology and culture. Dr.
Nyajeka obtained a Bachelor of Arts from Birmingham-Southern College, a Master of Divinity from
Duke Divinity School, a Master in Theology from Garrett-Evangelical Theological Seminary, and a
Doctor of Philosophy in History of Religions from Northwestern University. Furthermore, Dr. Nyajeka is
an ordained minister in the United Methodist Church. Because of her high credentials, ITC hired Dr.
Nyajeka on July 1, 1997 as an assistant professor of Missiology and Religions of the World.

During her time at ITC, Dr. Nyajeka taught classes focused on world religions, particularly
African traditional religions and indigenous churches, as well as the theology and practice of Christian



missions. Such courses included African Christianity, African Religion, African and Middle Eastern Religions, Philosophy and Practice of Traditional African Religions, Ministry and Context, and Congregational Evangelism.

As a result of her expertise and high caliber as a professor at ITC, on June 13, 2006, Dr. Nyajeka was elevated to the Dorothye and Cornelius Henderson Chair and E. Stanley Jones Associate Professor of Evangelism, Missiology, and Religions of the World[1] (see Exhibit A: Letter from Office of the President). This letter specifically stated that "[t]he terms of your position are governed by the policies and procedures set forth in the Faculty Handbook." Therefore, a contractual agreement was created between ITC and Dr. Nyajeka and the terms of her employment were governed by the Faculty Handbook.

Dr. Nyajeka's base salary for both positions of the Chair and the Professorship for the 2006-2007 academic year was only Forty Six Thousand Five Hundred Dollars ($46,500.00) (see Exhibit A). Furthermore, Dr. Nyajeka's fringe benefits included payments of Eight Percent (8%) of her salary for pension in an ITC sponsored plan, Seventy Percent (70%) of the cost for ITC's sponsored major medical and dental coverage, group life insurance, and group short-term disability (see Exhibit A). However, during the entirety of her position as Chair and E. Stanley Jones Professor, ITC wrongly and egregiously denied Dr. Nyajeka pension payments from 1997 through 2006. Furthermore, the base salary for a similarly qualified male in an endowed Chair or similar position at ITC during the years of 2005 through 2012 was Eighty Five Thousand Dollars ($85,000.00) per year and not a mere Forty Six Thousand Five Hundred Dollars ($46,500.00) per year. In addition to the duties and responsibilities of being a Chair and an E. Stanley Jones Professor, Dr. Nyajeka continued in her role as Associate Professor of Missiology and World Religions. Notwithstanding her qualifications, academic accomplishments, and additional duties and responsibilities, Dr. Nyajeka's salary remained virtually unchanged through the rest of her time at ITC as she was continually denied salary negotiations and salary adjustments, resulting in ITC's violation of the Federal Equal Pay Act. Furthermore, Dr. Nyajeka was denied retirement benefits from 1997 through 2006. For three (3) years, Dr. Nyajeka was also denied a key to her own office at ITC, was denied computer equipment for her office, denied office heating and air conditioning, and the interior of the office remained in a permanent state of disrepair. Such denial of proper office conditions and denial of access to basic office and computer equipment was a direct violation of Section 2.14 of the Faculty Handbook.

On January 14, 2011, ITC's then Dean, Dr. E. P. Wimberly, sent Dr. Nyajeka a letter stating that ITC would not renew her teaching contract for the following two reasons: 1) the Foundation was not continuing to fund the Chair, and 2) Dean Wimberly had received "a letter of concern with [Dr. Nyajeka's] work from Area III." However, Dean Wimberly's letter was extremely vague and provided no proof of any alleged "concern[s]" with any of Dr. Nyajeka's work. Furthermore, Dr. Nyajeka was never made aware of any such reports of alleged "concern" by any of ITC's administrators or supervisors. Then, in a letter dated April 21, 2011, ITC's President reaffirmed to Dr. Nyajeka the contents of Dean Wimberly's January 14, 2011 letter and reiterated that ITC would not overturn its decision in regards to the non-renewal of Dr. Nyajeka's teaching contract. The April 21, 2011 letter also informed Dr. Nyajeka that ITC considered the matter closed. Although Dr. Nyajeka's contract was not set to expire until June of 2012, Dr. Nyajeka's employment at ITC was instead terminated on June 30, 2011. However, Dr. Nyajeka

---

[1] The E. Stanley Jones Professorship was renewable every three (3) years. Dr. Nyajeka's Professorship was renewed in June of 2009, and therefore was eligible for renewal once again in June of 2012.



was never allowed to defend herself against ITC's wrongful termination as she was denied any and all appeals and denied relief under ITC's grievance process, as required by ITC's Faculty Handbook.

## II.   ITC SIMULTANEOUSLY VIOLATED SACS STANDARDS FOR THE RETENTION OF QUALIFIED FACULTY MEMBERS AND ITS OWN SEVERANCE POLICIES WHEN IT WRONGFULLY AND ARBITRARILY TERMINATED DR. NYAJEKA'S EMPLOYMENT AT ITC

ITC's actions with regards to the January 14, 2011 letter and the termination of Dr. Nyajeka on June 30, 2011 violated the Southern Association of Colleges and Schools ("SACS") Standards section 3.7.1., which states as follows:

*"The institution employs competent faculty members qualified to accomplish the mission and goals of the institution. When determining acceptable qualifications of its faculty, an institution gives primary consideration to the highest earned degree in the discipline. The institution also considers competence, effectiveness, and capacity, including, as appropriate, undergraduate and graduate degrees, related work experiences in the field, professional licensure and certifications, honors and awards, continuous documented excellence in teaching, or other demonstrated competencies and achievements that contribute to effective teaching and student learning outcomes."*

As previously demonstrated, because of her high pedigree of education, publications, and professionalism, Dr. Nyajeka was the most qualified and competent individual for the positions of the Dorothye and Cornelius Henderson Chair and E. Stanley Jones Associate Professor of Evangelism, Missiology, and Religions of the World. In fact, Dr. Nyajeka was so qualified that she endured several independent committee searches from 1999 to 2006 during which she was consistently chosen as the most qualified individual for these positions. However, Dr. Nyajeka's promotion and appointment to the position of Chair was the cause of great resentment against her by her peers. As a result, during a monthly Area III meeting in September of 2010, Dr. Marsha Haney read aloud a piece of paper outlining "concerns" with Dr. Nyajeka's work. However, Dr. Nyajeka had never been openly attacked in the form of a public evaluation, much less during a monthly Area meeting. Dr. Haney and Dr. Rasor both began screaming at Dr. Nyajeka demanding that she "step down from the Chair and get back to [her] regular teaching position!" When Dr. Nyajeka was asked to comment, she stated that she would respond in writing through a letter addressed to everyone in the Area. As such, Dr. Nyajeka wrote a response letter to Dr. Haney dated October 18, 2010, and every Area III member received a copy of this letter (see Exhibit B: Response Letter to Dr. Marsha Haney). In her letter to Dr. Haney, Dr. Nyajeka pointed out that she and Dr. Haney were the only two people in the Department of Missiology and Religion. As such, Dr. Nyajeka asked Dr. Haney why she did not discuss her concerns directly with Dr. Nyajeka prior to the monthly Area meeting. Dr. Nyajeka then described and elaborated on the hostility and abuse to which she had been subjected while at ITC. On October 25, 2010, Dr. McCrary, Area III Chair, convened an Area emergency meeting to respond to Dr. Nyajeka's letter. Dr. McCrary then apologized to Dr. Nyajeka on behalf of Area III and it was agreed that the matter was thus resolved.

Notwithstanding the fact that the September 2010 matter had been resolved, Dr. Haney wrote a letter to Dean Wimberly, dated January 17, 2011, where Dr. Haney outlined manufactured "concerns"



with regards to Dr. Nyajeka's work and competence. The content of this letter was similar to the
document Dr. Haney read aloud at the September Area meeting. However, since Dean Wimberly's letter
was from January 14, 2011, it is obvious that he never received any letter of "concern," as referenced in
his letter to Dr. Nyajeka, prior to writing his letter. However, Area III Chair Dr. McCrary confronted
Dean Wimberly to make him admit that no such letter ever came from Area III. Unfortunately, Dr.
McCrary was ignored. Furthermore, no one ever contacted Dr. Nyajeka or the Area III Chair, Dr.
McCrary, regarding the foundation funding coming to an end. Yet despite ITC's own blatant
inconsistencies, Dr. Nyajeka was wrongfully terminated out of manufactured and false "concerns."

Section 2.17(B)(2) of the Faculty Handbook enumerates eight (8) specific reasons for termination,
and "concern" is not listed within this subsection. Rather, a faculty's termination and non-renewal may
be based on "professional incompetence" but not "concern," which is a vague and unrecognized basis for
termination and non-renewal. During the entirety of her position as Chair and E. Stanley Jones Professor,
Dr. Nyajeka received no warnings in regards to her performance and no notices of any ethical violations.
Furthermore, Dr. Nyajeka received no letters or calls from the Dean, Area Chairs, or the Committee of
Faculty Status, Tenure and Welfare. Dr. Nyajeka's student and peer evaluations were continuously
positive and reflected the overall satisfaction with and admiration for Dr. Nyajeka's competence and
expertise as a professor at ITC. Furthermore, Dr. Nyajeka's Faculty Evaluation from 2010 was recorded
as 'Excellent.' In addition, throughout her time at ITC, Dr. Nyajeka was subjected to three (3) clandestine
and unexpected "site visits" from male coordinators from the Foundation of Evangelism. Even after these
surprise visits, Dr. Nyajeka never received negative feedback or negative reviews, as the coordinators
themselves never expressed nor communicated any "concern" whatsoever regarding Dr. Nyajeka's
competence in the fulfillment of her duties. If Dr. Nyajeka's professional competence was ever in
question, ITC should have followed the requirements of Section 2.17 of the Faculty Handbook. However,
Dr. Nyajeka received no negative feedback. Knowing this, ITC instead relied on false hearsay
information in order to conclude that Dr. Nyajeka's work caused "concern" and thus she was not fit to
remain at ITC. Dr. Nyajeka was ultimately terminated on June 30, 2011 simply out of a manufactured
and false "concern with [her] work." Furthermore, ITC deliberately and spitefully circumvented its own
policies and procedures through the way it terminated Dr. Nyajeka's employment.

Pursuant to Section 2.17(D)-(H) of the Faculty Handbook, the Dean of ITC does not have the
authority to terminate, decide to not renew, or otherwise remove the faculty member from his or her
position(s). Rather, the Provost is required to receive all complaints against the faculty member, and then
confer with the President of ITC. The President would then be required to commence formal proceedings
against the faculty member, and the President, along with the Committee, would prepare a report of its
findings and recommendation to send to the Board of Trustees. The Board of Trustees would then make
the final decision based on this report. Therefore, the Board of Trustees, and not the Dean, is the only
body that has all final decision making authority for termination based upon reports and recommendations
submitted to it by the President and the Committee. However, the January 14, 2011 non-renewal letter
was merely a disguised and veiled pretextual attempt to circumvent ITC's own Severance Policies by
deliberately basing the termination of Dr. Nyajeka's employment on a false and manufactured "concern
for [her] work from Area III" knowing that there were no valid grounds for Dr. Nyajeka's termination.
Notwithstanding its obligations towards Dr. Nyajeka, ITC provided her with no due process under the
Faculty Handbook and instead egregiously and unilaterally terminated Dr. Nyajeka's employment with



ITC through the arbitrary and capricious decision made by Dean Wimberly, rather than the by the Board of Trustees, as required under ITC's own Severance Policies.

Ultimately, Dr. Nyajeka was dismissed from her duties on June 30, 2011 based upon the January 14, 2011 letter from Dean Wimberly, which itself was based on false hearsay information in order to conclude that Dr. Nyajeka's work caused "concern" and thus she was not fit to remain at ITC. Dean Wimberly's letter was a willful, deliberate, and gross circumvention of ITC's own severance policies. Furthermore, ITC violated SACS Standards by terminating the most qualified person for the Dorothye and Cornelius Henderson Chair and E. Stanley Jones Associate Professor of Evangelism, Missiology, and Religions of the World positions. However, the only "concern" should have been that ITC deliberately failed to abide by its own governance policies and therefore violated SACS Standard 3.7.1., and Section 2.17 of the Faculty Handbook.

## III.   ITC NEGLECTED ITS OBLIGATION TO DR. NYAJEKA WHEN IT FAILED PROVIDE AN ENVIRONMENT FREE OF HARASSMENT AND DISCRIMINATION

Section 3.6 of the Faculty Handbook states as follows:

> *"It is the policy and responsibility of ITC, as an Institution preparing women and men for leadership roles in the church, to establish an environment of trust in which the dignity and worth of all members of the institutional community are respected. Therefore, ITC will not condone or disregard incidents of harassment on the basis of sex, sexual orientation, race, national origin, or other immutable characteristics."*

ITC's policy of non-harassment spans through Sections 3.7, 3.8, and 3.9 of the Faculty Handbook. However, Dr. Nyajeka was routinely harassed and bullied by colleagues both verbally and physically. As an initial form of harassment, Dr. Nyajeka was sexually harassed by one of her colleagues, Dr. Temba Mafico, for the vast majority of her time at ITC, during which Dr. Mafico would pin Dr. Nyajeka in his office and would not let her leave. Furthermore, these same colleagues routinely harassed Dr. Nyajeka about her immigrant status and expressed hostility towards her immigrant status by saying things such as "you are not wanted here! … Black Americans do not like Africans!;" "go back to Africa, stop running away from your people, and don't come here to compete against Black Americans!;" "you are lucky to even have a job in this economy!"; and "are you here just to get your green card through ITC?" Furthermore, Dr. Nyajeka received many threats of deportation over the phone from people who were not even immigration officers. Dr. Nyajeka's immigration process should have only taken three (3) months to complete, yet it took nine (9) years while at ITC. Furthermore, during the entirety of these nine (9) years, Dr. Nyajeka was constantly subjected to personal threats, interrogations, isolation, ridicule, and abusive language. Despite the continual harassment and the continuous interrogations about her immigration status, Dr. Nyajeka was denied the right to hire her own immigration attorney. ITC treated Dr. Nyajeka as if the fact that she was foreigner did not entitle her to the protections of ITC's standards, procedures, and overall due process. As a result, these continued attacks against Dr. Nyajeka have devastated her health and emotional well-being.

ITC's actions violated the Association of Theological Schools ("ATS") Standard 8.1.2, which states:



*"Theological schools should support the quality of community through such means as policies regarding procedural fairness, discrimination, and sexual harassment."*

Section 3.11(A) of the Faculty Handbook states as follows:

*"ITC's internal procedures are intended to address, promptly and fairly, concerns and complaints about harassment at this Institution. All complaints will be handled without delay as undue delay may seriously hinder this Institution's ability to promptly review and investigate such allegations. All complaints are considered confidential and will be handled as such."*

Sections 3.12 and 3.13 of the Faculty Handbook specifically outline the steps and procedures for an informal complaint process and formal complaint process, respectively. Dr. Nyajeka complained about her discrimination and hostility on more than ten (10) occasions. Dr. Nyajeka pleaded with Dean Wimberly to address the abuse to which she was constantly subjected. However, Dean Wimberly's only response was for Dr. Nyajeka to "try and go out of [her] way to be 'nice.'" Furthermore, Dr. Nyajeka also complained about her sexual harassment on at least eight (8) occasions. Dr. Nyajeka pleaded with Dr. Haney, Chair of Area III, to make Dr. Mafico stop sexually harassing Dr. Nyajeka. However, Dr. Nyajeka's complaints of sexual harassment quickly served to undermine her efforts for promotion and professional development at the hands of Dr. Haney and Dr. Mafico. Dr. Nyajeka made further complaints to Dean Wimberly, Dr. Battle, Dr. Grant, Dr. McCrary, Dr. McHelvey, Bishop Norris, Dr. Jacobs, and ITC President Dr. Peters. In October of 2010, Dr. Nyajeka wrote a letter to Area III where she complained about Dr. Haney's and Dr. Razor's unprovoked verbal assault that took place during the regular beginning-of-semester Area meeting in September of 2010. In this letter, Dr. Nyajeka also documented a detailed account of her experiences of abuse, hostility, discrimination, and harassment.

Dr. Nyajeka also wrote a letter to ITC President Dr. Peters in response to his letter from April 21, 2011 through which Dr. Nyajeka provided a detailed account of all of her experiences of abuse and discrimination leading up to the January 14, 2011 letter from Dean Wimberly. After much unnecessary delay and avoidance on behalf of ITC, Dr. Peters finally invited Dr. Nyajeka to meet with him. At this meeting, Dr. Peters stated that he believed all of Dr. Nyajeka's claims and asked Dr. Nyajeka to submit her curriculum vitae so that the school can "rehire [her]." Yet despite the continued harassment, discrimination, and hostility, ITC continually turned a blind eye and deaf ear to all of Dr. Nyajeka's complaints. Furthermore, Dr. Nyajeka's complaints and requests to speak with ITC's President regarding her concerns were continually hampered and ignored. As a result, the hostile and subversive environment persisted against Dr. Nyajeka through which she suffered constant anxiety and stress. Furthermore, as a result of all of the continued hostility, discrimination, and harassment, Dr. Nyajeka suffered and continues to suffer from work-related depression, work-related post traumatic disorder, and in 2014, Dr. Nyajeka suffered a psychotic episode which caused her to collapse, after which she remained in a four (4)-day coma. Notwithstanding ITC's deliberate violations, and notwithstanding the emotional and psychological toll, Dr. Nyajeka was terminated out of a false and manufactured "concern" for her work. However, if at any point during her time at ITC Dr. Nyajeka's performance was less than stellar, it was only because of the hostile environment in which she was forced to perform. Therefore, ITC's willful contempt for Dr.



Nyajeka's safety and well-being was a direct violation of Sections 3.6, 3.7, 3.8, 3.9, 3.11, 3.12, and 3.13 of the Faculty Handbook, as well as ATS Standard 8.1.2.

## IV.   ITC'S WILFUL ACTIONS DEPRIVED DR. NYAJEKA OF HER ACADEMIC FREEDOM AND PROFESSIONAL DEVELOPMENT

SACS Standard 3.7.4 states:

*"The institution ensures adequate procedures for safeguarding and protecting academic freedom. The essential role of institutions of higher education is the pursuit and dissemination of knowledge. Academic freedom respects the dignity and rights of others while fostering intellectual freedom of faculty to teach, research, and publish."*

Dr. Nyajeka fulfilled her many daily duties and responsibilities as Chair and E. Stanley Jones Professor despite having to constantly endure a stressful, hostile, and discriminatory environment. However, despite her unmerited difficulties, Dr. Nyajeka remained positive and hopeful that her work would inspire within her students the same strong and relentless passion for missions that Dr. Nyajeka held while at ITC. As stated previously, for three (3) years, Dr. Nyajeka was denied a key to her own office at ITC, was denied computer equipment for her office, and the interior of the office remained in a permanent state of disrepair as it was supposedly being "remodeled."

For three (3) years, Dr. Nyajeka complained to security office Captain Terry and to Ms. Littlejohn about not having a key to her own office, and urgently wrote to Ms. Littlejohn on at least two separate occasions asking for a key. However, Ms. Littlejohn refused to comply with all requests and demanded that the requests be done in writing, notwithstanding the fact that Dr. Nyajeka had in fact made at least two (2) previous written requests to Ms. Littlejohn. Yet Ms. Littlejohn completely ignored all of Dr. Nyajeka's written requests and refused to provide her with access to her own office. Furthermore, during Dr. Nyajeka's entire fourteen (14) years at ITC, all of her express and written requests were ignored with regards to having heat in her office during winters, air conditioning during summers, replacement of old and broken furniture, and access to computer equipment. Dr. Nyajeka was never provided with a laptop until Dr. Battle came on board at ITC. However, even when ITC finally did provide Dr. Nyajeka with a laptop, ITC gave her the oldest laptop at the entire school. Then, in July of 2010, ITC spitefully and unexpectedly removed the laptop from Dr. Nyajeka's office and never returned it to Dr. Nyajeka. Dr. Nyajeka contacted the IT manager and asked him to allow her to retrieve her work documents from the laptop. However, the IT manager refused Dr. Nyajeka's request without any explanation. Unfortunately, all of Dr. Nyajeka's previous written requests with regards to proper office access, equipment, and office heating and air conditioning, written complaints of harassment and discrimination, and other pieces of evidence to support her claims against ITC were lost as a result of ITC removing the laptop and stubbornly refusing to allow Dr. Nyajeka to retrieve all of these documents.

ITC's actions also deprived Dr. Nyajeka of pursuing continued professional development. ATS Standard 5.4.2 states:

*"Schools shall provide structured opportunities for faculty research and intellectual growth, such as regular research leaves and faculty colloquia."*

JS44 (Rev. 6/2017 NDGA)

# CIVIL COVER SHEET

The JS44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form is required for the use of the Clerk of Court for the purpose of initiating the civil docket record. (SEE INSTRUCTIONS ATTACHED)

## I. (a) PLAINTIFF(S)

## DEFENDANT(S)

# 1:20-CV-4434

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED
PLAINTIFF_____
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED
DEFENDANT_____
(IN U.S. PLAINTIFF CASES ONLY)

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED

**(c)** ATTORNEYS (FIRM NAME, ADDRESS, TELEPHONE NUMBER, AND E-MAIL ADDRESS)

ATTORNEYS (IF KNOWN)

## II. BASIS OF JURISDICTION
(PLACE AN "X" IN ONE BOX ONLY)

☐ 1 U.S. GOVERNMENT PLAINTIFF

☐ 2 U.S. GOVERNMENT DEFENDANT

☐ 3 FEDERAL QUESTION (U.S. GOVERNMENT NOT A PARTY)

☐ 4 DIVERSITY (INDICATE CITIZENSHIP OF PARTIES IN ITEM III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES
(PLACE AN "X" IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT)
(FOR DIVERSITY CASES ONLY)

| | PLF | DEF | | PLF | DEF | |
|---|---|---|---|---|---|---|
| | ☐ 1 | ☐ 1 | CITIZEN OF THIS STATE | ☐ 4 | ☐ 4 | INCORPORATED OR PRINCIPAL PLACE OF BUSINESS IN THIS STATE |
| | ☐ 2 | ☐ 2 | CITIZEN OF ANOTHER STATE | ☐ 5 | ☐ 5 | INCORPORATED AND PRINCIPAL PLACE OF BUSINESS IN ANOTHER STATE |
| | ☐ 3 | ☐ 3 | CITIZEN OR SUBJECT OF A FOREIGN COUNTRY | ☐ 6 | ☐ 6 | FOREIGN NATION |

## IV. ORIGIN (PLACE AN "X" IN ONE BOX ONLY)

☐ 1 ORIGINAL PROCEEDING

☐ 2 REMOVED FROM STATE COURT

☐ 3 REMANDED FROM APPELLATE COURT

☐ 4 REINSTATED OR REOPENED

☐ 5 TRANSFERRED FROM ANOTHER DISTRICT (Specify District)

☐ 6 MULTIDISTRICT LITIGATION - TRANSFER

☐ 7 APPEAL TO DISTRICT JUDGE FROM MAGISTRATE JUDGE JUDGMENT

☐ 8 MULTIDISTRICT LITIGATION - DIRECT FILE

## V. CAUSE OF ACTION (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE - DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY)

(IF COMPLEX, CHECK REASON BELOW)

☐ 1. Unusually large number of parties.

☐ 2. Unusually large number of claims or defenses.

☐ 3. Factual issues are exceptionally complex

☐ 4. Greater than normal volume of evidence.

☐ 5. Extended discovery period is needed.

☐ 6. Problems locating or preserving evidence

☐ 7. Pending parallel investigations or actions by government.

☐ 8. Multiple use of experts.

☐ 9. Need for discovery outside United States boundaries.

☐ 10. Existence of highly technical issues and proof.

### CONTINUED ON REVERSE

FOR OFFICE USE ONLY

RECEIPT #_____   AMOUNT $_____   APPLYING IFP_____   MAG JUDGE (IFP)_____

JUDGE_____   MAG JUDGE_____   NATURE OF SUIT_____   CAUSE OF ACTION_____
(Referral)

# VI. NATURE OF SUIT (PLACE AN "X" IN ONE BOX ONLY)

**CONTRACT - "0" MONTHS DISCOVERY TRACK**
- [ ] 150 RECOVERY OF OVERPAYMENT & ENFORCEMENT OF JUDGMENT
- [ ] 152 RECOVERY OF DEFAULTED STUDENT LOANS (Excl. Veterans)
- [ ] 153 RECOVERY OF OVERPAYMENT OF VETERAN'S BENEFITS

**CONTRACT - "4" MONTHS DISCOVERY TRACK**
- [ ] 110 INSURANCE
- [ ] 120 MARINE
- [ ] 130 MILLER ACT
- [ ] 140 NEGOTIABLE INSTRUMENT
- [ ] 151 MEDICARE ACT
- [ ] 160 STOCKHOLDERS' SUITS
- [ ] 190 OTHER CONTRACT
- [ ] 195 CONTRACT PRODUCT LIABILITY
- [ ] 196 FRANCHISE

**REAL PROPERTY - "4" MONTHS DISCOVERY TRACK**
- [ ] 210 LAND CONDEMNATION
- [ ] 220 FORECLOSURE
- [ ] 230 RENT LEASE & EJECTMENT
- [ ] 240 TORTS TO LAND
- [ ] 245 TORT PRODUCT LIABILITY
- [ ] 290 ALL OTHER REAL PROPERTY

**TORTS - PERSONAL INJURY - "4" MONTHS DISCOVERY TRACK**
- [ ] 310 AIRPLANE
- [ ] 315 AIRPLANE PRODUCT LIABILITY
- [ ] 320 ASSAULT, LIBEL & SLANDER
- [ ] 330 FEDERAL EMPLOYERS' LIABILITY
- [ ] 340 MARINE
- [ ] 345 MARINE PRODUCT LIABILITY
- [ ] 350 MOTOR VEHICLE
- [ ] 355 MOTOR VEHICLE PRODUCT LIABILITY
- [ ] 360 OTHER PERSONAL INJURY
- [ ] 362 PERSONAL INJURY - MEDICAL MALPRACTICE
- [ ] 365 PERSONAL INJURY - PRODUCT LIABILITY
- [ ] 367 PERSONAL INJURY - HEALTH CARE/ PHARMACEUTICAL PRODUCT LIABILITY
- [ ] 368 ASBESTOS PERSONAL INJURY PRODUCT LIABILITY

**TORTS - PERSONAL PROPERTY - "4" MONTHS DISCOVERY TRACK**
- [ ] 370 OTHER FRAUD
- [ ] 371 TRUTH IN LENDING
- [ ] 380 OTHER PERSONAL PROPERTY DAMAGE
- [ ] 385 PROPERTY DAMAGE PRODUCT LIABILITY

**BANKRUPTCY - "0" MONTHS DISCOVERY TRACK**
- [ ] 422 APPEAL 28 USC 158
- [ ] 423 WITHDRAWAL 28 USC 157

**CIVIL RIGHTS - "4" MONTHS DISCOVERY TRACK**
- [ ] 440 OTHER CIVIL RIGHTS
- [ ] 441 VOTING
- [ ] 442 EMPLOYMENT
- [ ] 443 HOUSING/ ACCOMMODATIONS
- [ ] 445 AMERICANS with DISABILITIES - Employment
- [ ] 446 AMERICANS with DISABILITIES - Other
- [ ] 448 EDUCATION

**IMMIGRATION - "0" MONTHS DISCOVERY TRACK**
- [ ] 462 NATURALIZATION APPLICATION
- [ ] 465 OTHER IMMIGRATION ACTIONS

**PRISONER PETITIONS - "0" MONTHS DISCOVERY TRACK**
- [ ] 463 HABEAS CORPUS- Alien Detainee
- [ ] 510 MOTIONS TO VACATE SENTENCE
- [ ] 530 HABEAS CORPUS
- [ ] 535 HABEAS CORPUS DEATH PENALTY
- [ ] 540 MANDAMUS & OTHER
- [ ] 550 CIVIL RIGHTS - Filed Pro se
- [ ] 555 PRISON CONDITION(S) - Filed Pro se
- [ ] 560 CIVIL DETAINEE: CONDITIONS OF CONFINEMENT

**PRISONER PETITIONS - "4" MONTHS DISCOVERY TRACK**
- [ ] 550 CIVIL RIGHTS - Filed by Counsel
- [ ] 555 PRISON CONDITION(S) - Filed by Counsel

**FORFEITURE/PENALTY - "4" MONTHS DISCOVERY TRACK**
- [ ] 625 DRUG RELATED SEIZURE OF PROPERTY 21 USC 881
- [ ] 690 OTHER

**LABOR - "4" MONTHS DISCOVERY TRACK**
- [ ] 710 FAIR LABOR STANDARDS ACT
- [ ] 720 LABOR/MGMT. RELATIONS
- [ ] 740 RAILWAY LABOR ACT
- [ ] 751 FAMILY and MEDICAL LEAVE ACT
- [ ] 790 OTHER LABOR LITIGATION
- [ ] 791 EMPL. RET. INC. SECURITY ACT

**PROPERTY RIGHTS - "4" MONTHS DISCOVERY TRACK**
- [ ] 820 COPYRIGHTS
- [ ] 840 TRADEMARK

**PROPERTY RIGHTS - "8" MONTHS DISCOVERY TRACK**
- [ ] 830 PATENT
- [ ] 835 PATENT-ABBREVIATED NEW DRUG APPLICATIONS (ANDA) - a/k/a Hatch-Waxman cases

**SOCIAL SECURITY - "0" MONTHS DISCOVERY TRACK**
- [ ] 861 HIA (1395ff)
- [ ] 862 BLACK LUNG (923)
- [ ] 863 DIWC (405(g))
- [ ] 863 DIWW (405(g))
- [ ] 864 SSID TITLE XVI
- [ ] 865 RSI (405(g))

**FEDERAL TAX SUITS - "4" MONTHS DISCOVERY TRACK**
- [ ] 870 TAXES (U.S. Plaintiff or Defendant)
- [ ] 871 IRS - THIRD PARTY 26 USC 7609

**OTHER STATUTES - "4" MONTHS DISCOVERY TRACK**
- [ ] 375 FALSE CLAIMS ACT
- [ ] 376 Qui Tam 31 USC 3729(a)
- [ ] 400 STATE REAPPORTIONMENT
- [ ] 430 BANKS AND BANKING
- [ ] 450 COMMERCE/ICC RATES/ETC.
- [ ] 460 DEPORTATION
- [ ] 470 RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS
- [ ] 480 CONSUMER CREDIT
- [ ] 490 CABLE/SATELLITE TV
- [ ] 890 OTHER STATUTORY ACTIONS
- [ ] 891 AGRICULTURAL ACTS
- [ ] 893 ENVIRONMENTAL MATTERS
- [ ] 895 FREEDOM OF INFORMATION ACT
- [ ] 899 ADMINISTRATIVE PROCEDURES ACT / REVIEW OR APPEAL OF AGENCY DECISION
- [ ] 950 CONSTITUTIONALITY OF STATE STATUTES

**OTHER STATUTES - "8" MONTHS DISCOVERY TRACK**
- [ ] 410 ANTITRUST
- [ ] 850 SECURITIES / COMMODITIES / EXCHANGE

**OTHER STATUTES - "0" MONTHS DISCOVERY TRACK**
- [ ] 896 ARBITRATION (Confirm / Vacate / Order / Modify)

* **PLEASE NOTE DISCOVERY TRACK FOR EACH CASE TYPE. SEE LOCAL RULE 26.3**

# VII. REQUESTED IN COMPLAINT:
- [ ] CHECK IF CLASS ACTION UNDER F.R.Civ.P. 23   DEMAND $_____

JURY DEMAND [ ] YES [ ] NO (CHECK YES ONLY IF DEMANDED IN COMPLAINT)

# VIII. RELATED/REFILED CASE(S) IF ANY
JUDGE_____   DOCKET NO._____

CIVIL CASES ARE DEEMED RELATED IF THE PENDING CASE INVOLVES: (CHECK APPROPRIATE BOX)
- [ ] 1. PROPERTY INCLUDED IN AN EARLIER NUMBERED PENDING SUIT.
- [ ] 2. SAME ISSUE OF FACT OR ARISES OUT OF THE SAME EVENT OR TRANSACTION INCLUDED IN AN EARLIER NUMBERED PENDING SUIT.
- [ ] 3. VALIDITY OR INFRINGEMENT OF THE SAME PATENT, COPYRIGHT OR TRADEMARK INCLUDED IN AN EARLIER NUMBERED PENDING SUIT.
- [ ] 4. APPEALS ARISING OUT OF THE SAME BANKRUPTCY CASE AND ANY CASE RELATED THERETO WHICH HAVE BEEN DECIDED BY THE SAME BANKRUPTCY JUDGE.
- [x] 5. REPETITIVE CASES FILED BY PRO SE LITIGANTS.
- [ ] 6. COMPANION OR RELATED CASE TO CASE(S) BEING SIMULTANEOUSLY FILED (INCLUDE ABBREVIATED STYLE OF OTHER CASE(S)):

- [ ] 7. EITHER SAME OR ALL OF THE PARTIES AND ISSUES IN THIS CASE WERE PREVIOUSLY INVOLVED IN CASE NO. _____ , WHICH WAS DISMISSED. This case [ ] IS [ ] IS NOT (check one box) SUBSTANTIALLY THE SAME CASE.

SIGNATURE OF ATTORNEY OF RECORD _____   DATE _____